Not Reported in A.2d
33 Conn. L. Rptr. 187
(Cite as: 2002 WL 31126293 (Conn.Super.))

**H**
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut.

CITY OF NEW HAVEN,
v.
CONNECTICUT SITING COUNCIL et al.

No. CV020513195S.

Aug. 21, 2002.

CARL J. SCHUMAN, Judge.

*1 The plaintiffs, the City of New Haven ("City")
and the Attorney General, have each appealed from
the final decision of the defendant, Connecticut
Siting Council ("Siting Council"), approving the
application of the defendant, Cross- Sound Cable
Company, LLC ("Cross-Sound"), to install and
operate a high voltage direct current submarine
electric transmission and fiber optic cable system
("the cable") that would run from New Haven
Harbor underneath the Long Island Sound to
Brookhaven, New York. For the reasons discussed
below, the court dismisses both appeals.

I

The record discloses the following facts. On July 7,
2000, TransEnergie U.S. Ltd. applied to the Siting
Council for a certificate of environmental
compatibility and public need ("certificate")
concerning an electric cable that would run
approximately twenty-four miles under the Long
Island Sound from New Haven to Brookhaven.
(Return of Record ("ROR"), XXXIX, Item 13,
Findings of Fact, p. 1, ¶ 1; p. 12, ¶ 58.) See
General Statutes § 16-50k(a). [FN1] The Siting
Council found that the cable project was "not
essential or necessary for the reliability of the
electric power supply of the State or for the
development of a competitive market for
electricity." (ROR, XXXIX, Item 13, Opinion, p.
3.) The Siting Council denied the application
without prejudice, concluding that the limited

benefits from the project and its effects on the
natural environment were not balanced and were in
conflict with state policy. (ROR, XXXIX, Item 13,
Opinion, p. 3; Decision and Order.)

FN1. Section 16-50k(a) provides as
follows:
Except as provided in subsection (b) of
section 16-50z, no person shall exercise
any right of eminent domain in
contemplation of, commence the
preparation of the site for, or commence
the construction or supplying of a facility,
or any modification of a facility, that may,
as determined by the council, have a
substantial adverse environmental effect,
in the state without having first obtained a
certificate of environmental compatibility
and public need, hereinafter referred to as
a "certificate," issued with respect to such
facility or modification by the council,
except fuel cells with a generating capacity
of ten kilowatts or less which shall not
require such certificate. Any facility with
respect to which a certificate is required
shall thereafter be built, maintained and
operated in conformity with such
certificate and any terms, limitations or
conditions contained therein.
Notwithstanding the provisions of this
subsection, the council shall, in the
exercise of its jurisdiction over the siting
of generating facilities, approve by
declaratory ruling (1) the construction of a
facility solely for the purpose of generating
electricity other than an electric generating
facility that uses nuclear materials or coal
as fuel, at a site where an electric
generating facility operated prior to July 1,
1998, and (2) the construction or location
of any fuel cell, unless the council finds a
substantial adverse environmental effect.
In the context of this case, "facility" means
"[a]n electric transmission line of a design
capacity of sixty-nine kilovolts or more,
including associated equipment but not
including a transmission linetap ..."
General Statutes § 16-50i(a)(1).

Cross-Sound, a joint venture of TransEnergie and

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
33 Conn. L. Rptr. 187
(Cite as: 2002 WL 31126293 (Conn.Super.))

Page 2

two other corporations, reapplied for a certificate on July 24, 2001. The new application proposed a different route in an attempt to minimize the impact to shellfish resources in New Haven Harbor. At the same time, Cross-Sound filed a petition for a declaratory ruling that no certificate was required for the construction, maintenance, and operation of an electric converter substation located in the City of New Haven. On January 3, 2002, after numerous public hearings involving the plaintiffs as well as intervenors from the General Assembly, the Office of Consumer Counsel, and various interest groups, the Siting Council granted the certificate for the cable. (ROR, XXXIX, Item 1 (Findings of Fact), pp. 1-2 ¶¶ 1-3, 6, 8; Item 3 (Decision and Order).) [FN2] The plaintiffs appeal from this decision. In a separately docketed ruling, the Siting Council decided that the proposed electric substation "would not have a substantial adverse environmental effect" and thus would not require a certificate. (ROR, XXXIX, Item 6.) The plaintiffs have not appealed from this decision. [FN3]

FN2. The Siting Council's ultimate conclusion was that:
[T]he effects associated with the construction, operation, and maintenance of a HVDC submarine electric transmission and fiber optic cable system from New Haven, Connecticut to Brookhaven, New York, including effects on the natural environment; ecological integrity and balance; forests and parks; scenic, historic, and recreational values; air and water purity; fish and wildlife; and public health and safety are not disproportionate either alone or cumulatively with other effects when compared to benefit, [and] are not in conflict with the policies of the State concerning such effects ...
(ROR, XXXIX, Item 2 (Opinion), p. 4.)

FN3. The court denied seventeen motions to intervene as parties in this appeal, mostly filed by General Assembly members, but granted permission to the Office of Consumer Counsel to submit an amicus curiae brief.

II

At the outset, the court must confront several jurisdictional challenges raised by the defendants. The Siting Council initially argues that both appeals are moot. The premise of its argument is that any harm from the cable stems from the installation process, which the Siting Council alleges is essentially complete. Based on the representations of the parties at oral argument, however, the court finds that at this time the installation process is not complete. Further, operation of the cable after it is installed also has environmental consequences. For example, operation of the cable would cause a temperature increase of .2 degrees Fahrenheit at the surface of the seabed. (ROR, Findings of Fact, p. 6, ¶ 27.) While the Siting Council found that this increase is insignificant (ROR, Findings of Fact, p. 6, ¶ 27; p. 21, ¶ 105; XXXIX, Item 2 (Opinion), p. 3), the court cannot say that "a controversy between the parties no longer exists." (Internal quotation marks omitted.) *Crest Pontiac Cadillac, Inc. v. Hadley,* 239 Conn. 437, 439 n. 3, 685 A.2d 670 (1996). Therefore, the appeals are not moot.

III

*2 Cross-Sound urges the court to conclude that both plaintiffs lack standing to appeal. The court begins with the principle that the right to appeal an administrative decision is created only by statute and a party must exercise that right in strict compliance with the statute in order for the court to have jurisdiction. See *New England Rehabilitation Hospital of Hartford, Inc. v. Commission on Hospitals and Health Care,* 226 Conn. 105, 120, 627 A .2d 1257 (1993). With respect to decisions of the Siting Council, General Statutes § 16-50q provides that "[a]ny party may obtain judicial review of an order issued on an application for a certificate or an amendment of a certificate in accordance with the provisions of section 4-183." Section 4-183(a), which is part of the Uniform Administrative Procedure Act, General Statutes § 4-166 et seq. ("UAPA"), provides that "[a] person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section."

Accordingly, in order to have standing to bring an administrative appeal from a decision of the Siting

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Council under § 4-183(a), a person or entity must be aggrieved. See *Southern New England Telephone Co. v. Department of Public Utility Control,* 64 Conn.App. 134, 139-43, 779 A.2d 817 (2001), cert. dismissed, 260 Conn. 180 (2002) (holding that General Statutes § 16-35, which provides for appeals from the decisions of the department of public utility control "in accordance with the provisions of section 4-183," incorporates the "final decision" component of § 4-183(a)). See generally *New England Rehabilitation Hospital of Hartford, Inc. v. Commission on Hospitals and Health Care, supra,* 226 Conn. at 120. "Aggrievement is a question of fact for the trial court and the plaintiff has the burden of proving that fact ... Pleading and proof of facts that constitute aggrievement are essential prerequisites to the trial court's subject matter jurisdiction over an administrative appeal." (Citation omitted.) *Id.* Cf. *Ganin v. Smith & Wesson Corp.,* 258 Conn. 313, 348, 780 A.2d 98 (2001) ("whether a party has standing, based upon a given set of facts, is a question of law for the court").

Under our law, there is both classical and statutory aggrievement. See *Terese B. v. Commissioner of Children and Families,* 68 Conn.App. 223, 228, 789 A.2d 1114 (2002).
   Classical aggrievement requires a two-part showing. First, a party must demonstrate a specific, personal and legal interest in the subject matter of the decision, as opposed to a general interest that all members of the community share ... Second, the party must also show that the agency's decision has specially and injuriously affected that specific personal or legal interest ... Aggrievement does not demand certainty, only the possibility of an adverse effect on a legally protected interest ...
   *3 Statutory aggrievement exists by legislative fiat, not by judicial analysis of the particular facts of the case. In other words, in cases of statutory aggrievement, particular legislation grants standing to those who claim injury to an interest protected by that legislation.
(Internal quotation marks omitted.) *Id.*

### A

Beginning with the City's appeal, Cross-Sound maintains that there is neither classical nor statutory aggrievement. The City's attempt to establish

classical aggrievement begins with the introductory paragraphs in its appeal petition, which refer to "the value of the New Haven Harbor and the Port of New Haven to the welfare of the people of the City and State"; to a finding by the Siting Council that interruptions in shipping activity in New Haven Harbor would have "an adverse effect on the local and regional economy ..."; to a finding that "deepening the channel by dredging to 42 feet below mean low water will be necessary in the future for the Port [of New Haven] to maintain market share, and that deepening could not occur with a cable buried in the middle of the navigation channel"; and to a finding that the cable could "obstruct navigation and would be vulnerable to anchor strikes." (Appeal and Verified Petition, ¶¶ 9, 10.) The City then alleges that "[i]n accordance with Conn. Gen.Stat. §§ 16-50q, 16-50n, 4-183(c) and RCSA § 16-50j-17, the City, as host municipality and named party is deemed aggrieved by, and may appeal from, the Council's decision." (Appeal and Verified Petition, ¶ 13.) In the first count of its appeal petition, identified as the UAPA count, the City similarly alleges: "[a]s the host municipality for the cable project and a party to the proceeding, the City of New Haven has legal rights that are specifically affected by the Council's decision in this case and is aggrieved." (Appeal and Verified Petition ¶ 14.) (See also Appeal and Verified Petition ¶ 15a, alleging that the Siting Council failed to make findings of fact concerning the "highly adverse impacts on the future of the Harbor and the Port resulting from the costly and permanent nature of the cable placement.")

The court finds no appellate precedent for the notion that, as "host municipality" to the cable project, the City acquires standing. In administrative appeals or similar cases in which our appellate courts have found municipalities to have standing as representatives of their inhabitants, there has been specific harm to the municipality such as damage to town property, see *Town of Milford v. Commissioner of Motor Vehicles,* 139 Conn. 677, 681, 96 A.2d 806 (1953) (possible hazard posed to town park), or interference with the town's zoning or other regulatory authority. See *Town of Westport v. Connecticut Siting Council,* 260 Conn. 266, 272 (2002); *Town of Guilford v. Landon,* 146 Conn. 178, 179-80, 148 A.2d 551 (1959). In *City of New Haven v. Public Utilities Commission,* 165 Conn. 687, 698-704, 345 A.2d

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
33 Conn. L. Rptr. 187
(Cite as: 2002 WL 31126293 (Conn.Super.))

Page 4

563 (1974), the Supreme Court found that the trial court did not abuse its discretion in finding that the City had a "substantial interest in the matter of construction of facilities by public service companies *within its corporate limits*," based on evidence that proposed electrical transmission lines would have a "damaging effect ... on development, open spaces, parks and recreational programs in certain neighborhood areas within the city of New Haven ..." (Emphasis added.) *Id.,* at 699.

*4 The case before this court is different. The City does not allege any interference with its regulatory authority or harm to its property. It is true that part of the cable project that the Siting Council approved--specifically, the electric substation and at least some of a "directional drilling" connector that would run 1,600 feet from the substation to the federal navigational channel--is within the corporate limits of New Haven. (ROR, Findings of Fact, p. 7, ¶ 36; p. 15, ¶ 72; Decision and Order.) As stated, however, the City did not appeal the Siting Council's decision approving the electric substation. Although the Siting Council's approval of the directional drilling component was part of the same decision approving the cable that the City did appeal, the City does not allege that the directional drilling causes it any harm or that the cable project as a whole creates the risk of any damage to that part of the City where the directional drilling will take place.

The City does allege that the Siting Council's decision will impair its ability to dredge "the navigation channel." (Appeal and Verified Petition, ¶ 10.) But there is no allegation that the navigation channel is within city limits. The Siting Council noted that the "Federal Navigational Channel" is maintained by the Army Corps of Engineers (ROR, Findings of Fact, p. 2, ¶ 11; p. 12, ¶ 57; Opinion, p. 2), thus suggesting that the navigational channel is in federal waters. At oral argument, counsel for the City made clear that the City is not alleging that the cable will interfere with any dredging activity to take place within the City's borders. [FN4] In short, the City does not allege damage to any property within its corporate limits. [FN5]

FN4. The City's appeal petition also refers to "New Haven Harbor" and the "Port of New Haven." The City alleges that "New

Haven Harbor is home to the Port of New Haven ..." It also refers to "[t]he navigation channel in the Harbor ..." (Appeal and Verified Petition, ¶¶ 9, 9a, 9e.) These statements leave unclear whether any portion of these entities constitutes city property. The Siting Council observed that at least part of the federal navigational channel was "within New Haven Harbor." (ROR, Findings of Fact, p. 12, ¶ 59.) In view of the City's disclaimer of any interference with dredging within city limits, the court need not resolve these uncertainties.

FN5. The City also alleges the cable would be "vulnerable to anchor strikes." (Appeal and Verified Petition, ¶ 10.) This allegation reveals possible harm to Cross-Sound, which owns the cable, not to the City.

The City relies principally on the allegation that the cable will impair navigation and commerce in the adjoining harbor and ultimately detract from the welfare of the City "in the form of jobs, goods, revenues, and tax dollars ..." (Appeal and Verified Petition, ¶ 9.) The City, however, does not have a "legally protected interest" in economic growth through the maritime industry. *Terese B. v. Commissioner of Children and Families, supra,* 68 Conn.App. at 228; see generally *New England Rehabilitation Hospital of Hartford, Inc. v. Commission on Hospitals and Health Care, supra,* 226 Conn. at 137 ("Loss of future revenues is but a prospective and speculative injury, insufficient to qualify the plaintiff as aggrieved, unless the competition at issue is 'unfair' or 'illegal' "). Although it is reasonable to hope that the City will prosper in the future, the reality is that the City has no legally enforceable right to enhanced commercial activity. Rather, the City's concern for its economic well-being is a "general interest that all members of the community share ..." *Terese B. v. Commissioner of Children and Families, supra,* at 228. As such, it is insufficient to establish classical aggrievement. *Id.* [FN6]

FN6. The court's conclusion is based on

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
33 Conn. L. Rptr. 187
(Cite as: 2002 WL 31126293 (Conn.Super.))

Page 5

the inadequacy of the City's allegations, not its proof. The City offered to prove its allegations. The court's reasoning means that even if the City had done so, the proof would not establish standing as a matter of law. See *Ganin v. Smith & Wesson Corp., supra,* 258 Conn. at 348.

B

*5 The second count of the City's appeal petition purports to arise under the Connecticut Environmental Protection Act ("CEPA"), which is codified in General Statutes §§ 22a-14 to 22a-20. In particular, the City claims it has statutory aggrievement under General Statutes § 22a-19(a). (Appeal and Verified Petition, ¶ 21.) Section 22a-19(a) provides as follows:

In any administrative, licensing or other proceeding, and in any judicial review thereof made available by law, the Attorney General, any political subdivision of the state, any instrumentality or agency of the state or of a political subdivision thereof any person, partnership, corporation, association, organization or other legal entity may intervene as a party on the filing of a verified pleading asserting that the proceeding or action for judicial review involves conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state.

The City alleges that the cable project will likely have the effect of "unreasonably polluting, impairing, or destroying the public trust in the vitality of the [New Haven] Harbor and its usefulness as a shipping channel." (Appeal and Verified Petition, ¶ 22.) It also alleges that the cable project will interfere with harbor improvements, resulting in a diversion of maritime cargo to trucks, thereby increasing air pollution in New Haven. (Appeal and Verified Petition, ¶¶ 23-24.)

The City requested to participate as a party in the Siting Council proceedings "pursuant to its statutory rights under Conn. Gen.Stat. 16-50n" and the Siting Council granted the request. [FN7] (ROR, IX, Items 1, 2.) Cross-Sound now challenges the City's statutory standing on the ground that the City did

not participate or intervene in the Siting Council proceedings under § 22a-19. [FN8] Cross-Sound relies on the negative inferences from Supreme Court cases holding that when a party intervenes in administrative proceedings pursuant to § 22a-19, it has standing to appeal the environmental issues associated with the agency's decision. See *Branhaven Plaza, LLC v. Inland Wetlands Commission,* 251 Conn. 269, 276 n. 9, 740 A.2d 847 (1999); *Red Hill Coalition, Inc. v. Conservation Commission,* 212 Conn. 710, 715, 563 A.2d 1339 (1989). Cross Sound maintains that, absent intervention under § 22a-19, the City has no statutory standing to appeal.

FN7. Section 16-50n provides in pertinent part:
(a) The parties to a certification or amendment proceeding or to a declaratory ruling proceeding shall include: (1) The applicant, certificate holder, or petitioner; (2) each person entitled to receive a copy of the application or resolution under section 16-50l, if such person has filed with the council a notice of intent to be a party; (3) any domestic or qualified nonprofit corporation or association formed in whole or in part to promote conservation or natural beauty, to protect the environment, personal health or biological values, to preserve historical sites, to promote consumer interests, to represent commercial and industrial groups or to promote the orderly development of the areas in which the facility is to be located, if it has filed with the council a notice of intent to be a party; and (4) such other persons as the council may at any time deem appropriate.
(b) The council may permit any person to participate as an intervenor, in accordance with the provisions of section 4-177a, in a certification or amendment proceeding or a declaratory ruling proceeding.

FN8. Although the City's intervention letter mentions the environment in general terms, it does not cite § 22a-19 and it is not a "verified pleading" that "contains specific factual allegations setting forth the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
33 Conn. L. Rptr. 187
(Cite as: 2002 WL 31126293 (Conn.Super.))

environmental issue that the intervenor intends to raise," as is required by the decision in *Nizzardo v. State Traffic Commission,* 259 Conn. 131, 162, 164-65, 788 A.2d 1158 (2002). (ROR, IX, Item 1.)

The flaw in Cross-Sound's position is that, even under § 22a-19, intervention in the agency proceedings is not the only basis for appearing in the administrative appeal of the agency decision. In *Red Hill Coalition, Inc. v. Conservation Commission, supra,* 212 Conn. at 716, the Supreme Court held that a person who had not intervened in the administrative proceedings could, pursuant to § 22a-19, join a valid appeal initiated by other parties. The Appellate Court later summarized the law as follows: "Section 22a-19 does not grant [a party] the right to initiate their own appeal without having first participated in the administrative proceedings or having joined in an existing appeal by other parties." *Hyllen-Davey v. Plan & Zoning Commission,* 57 Conn.App. 589, 596, 749 A.2d 682, cert. denied, 253 Conn. 926, 754 A.2d 796 (2000). This summary tracks the wording of § 22a-19, which provides that any party may "intervene" in the "judicial review" of an administrative decision involving the environment. General Statutes § 22a-19; see *Hyllen-Davey v. Plan & Zoning Commission, supra,* at 595.

*6 Although the courts have not fully explained the legislative purpose behind allowing a party to intervene in an existing administrative appeal but not "initiate their own appeal," *Hyllen-Davey v. Plan & Zoning Commission, supra,* 57 Conn.App. at 596, the most logical explanation is that the legislature did not desire to see administrative appeals initiated by persons with no connection to the case other than their general concern for the environment. The legislature could reasonably have sought to avoid setting the "judicial machinery in motion" when no other party had standing to appeal. (Internal quotation marks omitted.) *Webster Bank v. Zak,* 259 Conn. 766, 774, 792 A.2d 66 (2002). But in the present case, this concern is not present. The Attorney General has filed an appeal from the same Siting Council ruling and, as the court will discuss, has standing to raise environmental issues. Although the court has not formally consolidated the Attorney General's appeal with the City's, the court has treated both appeals as

companion cases, as the writing of this joint decision illustrates. The City's appeal does not set the "judicial machinery in motion," *id.,* because even without that appeal, the court would have to address some of the same issues in resolving the Attorney General's appeal. It would exalt form over substance to hold that the City can obtain standing by intervening in the Attorney General's appeal but not by filing a companion appeal. In this unusual situation, the court holds that the City has statutory standing under § 22a-19.

C

An intervening party under § 22a-19 may only raise "environmental issues." *Red Hill Coalition, Inc. v. Conservation Commission, supra,* 212 Conn. at 715. A review of the City's brief reveals that it is difficult to conclude that the plaintiff has properly raised any issues, much less environmental issues. The section of the City's brief devoted to the merits of this appeal consists of a rambling twelve-page discussion of issues, some of which the City never raised before the Siting Council, without one citation to the case law. (City's Brief, pp. 9-21.) Under these circumstances, the court could conclude that the City has not properly preserved and briefed any issues on appeal. See *Merchant v. State Ethics Commission,* 53 Conn.App. 808, 818, 733 A.2d 787 (1999); *Burnham v. Administrator,* 184 Conn. 317, 322-23, 439 A.2d 1008 (1981).

In any event, most of the brief concerns issues other than the environment. The theme of the brief seems to be that the cable will harm maritime commerce in New Haven Harbor. [FN9] While the City alleges, without fully briefing, the claim that the cable project likely will "have the effect of unreasonably polluting, impairing, or destroying the public trust in the vitality of the Harbor and its usefulness as a shipping channel" (Appeal and Verified Petition, ¶ 22), this allegation does not constitute an environmental issue. The City's concern for the "public trust" is not clean water but rather more shipping. See *Nizzardo v. State Traffic Commission,* 259 Conn. 131, 198, 788 A.2d 1158 (2002) (Borden, J., dissenting) (agreeing that it would be bizarre to argue that the department of motor vehicles has jurisdiction over environmental issues under § 22a-19 because it "issues licenses to drive, and driving a car can contribute to air pollution"). [FN10]

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
33 Conn. L. Rptr. 187
(Cite as: 2002 WL 31126293 (Conn.Super.))

Page 7

FN9. "The cable installation and repair activity would create obvious 'interruptions or constraints on shipping activity in New Haven Harbor.' " (City's Brief, p. 12.) "The condition [that Cross-Sound cooperate with the Army Corps of Engineers], even if future generations remember that it exists, will not safeguard the important economic resource that is the Harbor, against interruptions and constraints on shipping activity caused by the cable(s)' presence." (City's Brief, p. 14.) "The Siting Council's failure to consider and weigh these equally important policy considerations [concerning 'the benefit to the public of maintaining a vigorous, competitive harbor'] (which are required to be weighed), resulted in a short-sighted decision that eases Long Island's short-term energy problems by creating long-term energy problems for Connecticut." (City's Brief, p. 19.)

FN10. The City also alleges that impairing maritime commerce in New Haven Harbor will result in increased truck traffic in the region, thereby causing air pollution, (Appeal and Verified Petition, ¶¶ 23-24.), but the City fails to brief this claim.

*7 The only environmental issue that the City does brief is the claim that the Department of Environmental Protection, in approving the installation of the cable, did not follow its own standard procedures concerning the time of year when it normally would allow dredging or other activities that might disturb the sediment, and did not forward a report of the Department of Agriculture to the Siting Council concerning this issue. (City's Brief pp. 15- 18.) This court cannot review this claim because it calls for an examination of matters outside the record. Indeed, it calls for review of an action by a different agency. Although the City labels this matter an "irregularity of procedure," the City did not make any request to expand the record pursuant to General Statutes § 4 183(i). [FN11] Therefore, the court is "confined to the record." General Statutes § 4-183(i). The record provides no support for the City's claim.

FN11. Section 4-183(i) provides:
The appeal shall be conducted by the court without a jury and shall be confined to the record. If alleged irregularities in procedure before the agency are not shown in the record or if facts necessary to establish aggrievement are not shown in the record, proof limited thereto may be taken in the court. The court, upon request, shall hear oral argument and receive written briefs.

Accordingly, the court dismisses the City's appeal.

IV
A

The court now addresses the appeal taken by the Attorney General. While the Attorney General does not claim that he is classically aggrieved in the usual sense, he does argue that he has authority to bring this appeal based on the common-las authority of his office. In *Blumenthal v. Barnes*, 261 Conn. 434 (2002), the Supreme Court recently held that the Attorney General is a " 'creature of statute' that is governed by statute and, thus, has no common-las authority." *Id.*, at 463. Accordingly, the court rejects the argument that the Attorney General has common-las authority to bring this appeal. [FN12]

FN12. The court observes that the Attorney General's claim that he has common-las authority seems particularly ill-suited for this case. As the court observed in *Barnes*, the claimed basis for common-las authority was that the common-las powers of the state's attorneys over civil matters devolved to the office of the Attorney General upon its establishment in 1897. *Blumenthal v. Barnes, supra*, at 443. The historic authority of the state's attorney, however, was to *represent* the Crown, the colony, and finally the State. *Id.*, at 444-45. It thus appears that the Attorney General, in claiming that there is common-las authority to sue the state or state agencies, is claiming the antithesis of the common law.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
33 Conn. L. Rptr. 187
**(Cite as: 2002 WL 31126293 (Conn.Super.))**

B

The real dispute is whether the Attorney General has statutory authority to bring this appeal. It is true that generally the Attorney General's statutory obligation is to defend state agencies, not to sue them. The broad mandate of the Attorney General is to "appear for ... all heads of departments and state boards, commissioners ... in all suits and other civil proceedings, except upon criminal recognizances and bail bonds, in which the state is a party or is interested, or in which the official acts and doings of said-officers are called into question ..." General Statutes § 3-125. Of particular relevance to this case, "[t]he Attorney General shall appoint an assistant attorney general or a special assistant attorney general to act as counsel for the Connecticut Siting Council." General Statutes § 16-50n(d). Any person applying to the Siting Council for a certificate shall serve a copy of the certificate on the Attorney General. General Statutes § 16-50l(b)(2). Civil proceedings to enforce the Siting Council's orders "may be brought by the Attorney General in the superior court for any judicial district affected by the violation." General Statutes § 16-50u.

On the other hand, the Attorney General apparently is entitled to become an independent party to Siting Council proceedings. General Statutes § 16-50n(a)(2) [FN13] Furthermore, as discussed, § 22a-19(a) provides that:

> FN13. Section 16-50n(a)(2) provides that the parties to a certification or other proceeding shall include each person entitled to receive a copy of the application under § 16-50l which, as mentioned, includes the Attorney General. See General Statutes § 16-50l(b)(2).

*8 In any administrative, licensing or other proceeding, and in any judicial review thereof made available by law, the *Attorney General* ... may intervene as a party on the filing of a verified pleading asserting that the proceeding or action for judicial review involves conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state.

(Emphasis added.) It is this statute upon which the Attorney General primarily relies as its authority for initiating this appeal . [FN14]

> FN14. The Attorney General also maintains that he can appeal pursuant to General Statutes § 16-50q. As quoted in the introduction to section III of this opinion, § 16-50q does not create an independent statutory right to appeal, but rather incorporates the requirements, including aggrievement, of § 4-183(a). Because the Attorney General cannot contend that he is classically aggrieved, but rather relies solely on statutory aggrievement, § 16-50q does not assist his cause.

As stated above, § 22a-19 literally authorizes only intervention, but the Supreme Court has ruled that a party that intervened in an administrative proceeding under § 22a-19 also has standing to initiate an administrative appeal. See *Branhaven Plaza, LLC v. Inland Wetlands Commission, supra,* 251 Conn. at 276 n. 9; *Red Hill Coalition, Inc. v. Conservation Commission, supra,* 212 Conn. at 715. In this case, the Attorney General did intervene in the administrative proceedings under § 22a-19 (ROR, XII, Items 2, 5), and thus ordinarily would have authority to initiate an appeal. Cross-Sound nonetheless argues that the Attorney General lacks the authority and power to initiate an administrative appeal, much like a corporate officer lacks power to initiate litigation for the corporation in violation of the corporate bylaws. The court does not accept this analogy. The Attorney General is an elected constitutional officer of the state. Conn. Const., art. IV, § 1. He is entrusted with the "public duty, as Attorney General, and his duty as a lawyer to protect the interest of his client, the people of the State." (Internal quotation marks omitted.) *Commission on Special Revenue v. Freedom of Information Commission,* 174 Conn. 308, 319, 387 A.2d 533 (1978). Based on this trust and duty, the Attorney General can decide on his own whether to invoke a remedy authorized by law. There is no need for an intermediate authorization from a board of directors or other body.

The court must therefore reconcile the apparent

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
33 Conn. L. Rptr. 187
**(Cite as: 2002 WL 31126293 (Conn.Super.))**

conflict between § 22a-19 which, as explained, authorizes the Attorney General to initiate an administrative appeal of a Siting Council decision involving environmental issues, and the statutes, such as General Statutes §§ 3-125 and 16- 50n(d), that require the Attorney General to represent the Siting Council. The court should seek to harmonize legislation to avoid conflict. See *Dodd v. Middlesex Mutual Assurance Co.,* 242 Conn. 375, 388, 698 A.2d 859 (1997). The obvious way of avoiding conflict is to find that the Attorney General's office can fulfill both duties at the same time. This approach is the one taken by the Attorney General's office in this case. The Attorney General and several Assistant Attorneys General have initiated and prosecuted this administrative appeal, while several other Assistant Attorneys General have independently represented the Siting Council.

**\*9** The objections to this procedure are not legislative, but ethical. In *Commission on Special Revenue v. Freedom of Information Commission, supra,* 174 Conn. at 308, the Supreme Court denied an ethical challenge to the general concept of different members of the Attorney General's office representing opposing state agencies. The Court, however, did not address some of the specific ethical concerns that might arise in a case like the present one. *Id.,* at 321-22. For example, given that one large office is representing opposing parties (albeit through different departments), there is a concern for the confidentiality of client communications. See Rules of Professional Conduct 1.6. There is also concern that the Assistant Attorneys General representing the Siting Council will have a conflict of interest in representing their client with zeal given that the Attorney General, who is their ultimate supervisor, represents the adverse party. See Rules of Professional Conduct 1.3, commentary.

The Attorney General and the Assistant Attorneys General representing the Siting Council have assured this court that they have taken all precautions to avoid disclosure of client confidences and that there is no conflict of interest. The court accepts these assurances. The court has not observed any ethically questionable activity. Accordingly, the court concludes that the Attorney General has the authority under § 22a-19, consistent with the Rules of Professional Conduct, to initiate suit against a state agency represented by other members of the Attorney General's office. [FN15]

> FN15. Given that the legislature has authorized the Attorney General to appoint either an assistant attorney general or a "special assistant attorney general" to represent the Siting Council, General Statutes § 16-50n(d), the legislature may have anticipated that the Attorney General would not necessarily defend the Siting Council in all cases, but instead would have to appoint outside counsel to do so.

### C

As discussed, § 22a-19 authorizes a party to raise only "environmental issues." *Red Hill Coalition, Inc. v. Conservation Commission, supra,* 212 Conn. at 715. In this appeal, the Attorney General raises three issues: whether the Siting Council had to consider the cumulative environmental impact of other proposed Long Island Sound cables and pipelines; whether the Siting Council had to consider alternative cable-routes that posed less risk to the environment; and whether the Siting Council properly found that the Cross-Sound cable satisfies the public benefit standard. The first two issues are indisputably environmental ones. The parties dispute whether the third issue qualifies.

The Attorney General's third issue focuses on General Statutes § 16- 50p(c)(2)(A), which provides that the Siting Council shall not issue a certificate for an electric transmission line that is substantially underwater unless it "finds and determines ... [a] public benefit for the facility." The same statute also provides that "[f]or purposes of subparagraph (A) of this subdivision, a public benefit exists if such a facility is necessary for the reliability of the electric power supply of the state or for the development of a competitive market for electricity." [FN16] The Attorney General argues that the Siting Council did not make the findings required by the statute and that, especially in view of the Siting Council's finding that the original TransEnergie proposal was not necessary, the evidence would not support any finding of necessity and public benefit concerning Cross-Sound's proposal.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
33 Conn. L. Rptr. 187
**(Cite as: 2002 WL 31126293 (Conn.Super.))**

Page 10

FN16. Section 16-50p(c)(2) provides in full:
The council shall not grant a certificate for a facility described in subdivision (1) of subsection (a) of section 16-50i which is substantially underground or underwater except where such facilities interconnect with existing overhead facilities, either as proposed or as modified by the council, unless it finds and determines: (A) A public benefit for the facility; (B) the nature of the probable environmental impact, including a specification of every single adverse and beneficial effect that, whether alone or cumulatively with other effects, conflict with the policies of the state concerning the natural environment, ecological balance, public health and safety, scenic, historic and recreational values, forests and parks, air and purity and fish and wildlife; (C) why the adverse effects or conflicts referred to in subparagraph (B) of this subdivision are not sufficient reason to deny the application; (D) in the case of a new electric transmission line, (i) what part, if any, of the facility shall be located overhead, (ii) that the facility conforms to a long-range plan for expansion of the electric power grid of the electric systems serving the state and interconnected utility systems and will serve the interests of electric system economy and reliability, and (iii) that the overhead portions of the facility, if any, are cost-effective and the most appropriate alternative based on a life- cycle cost analysis of the facility and underground alternatives to such facility and are consistent with the purposes of this chapter, with such regulations as the council may adopt pursuant to subsection (a) of section 16-50t, and with the Federal Energy Regulatory Commission "Guidelines For the Protection of Natural Historic Scenic and Recreational Values in the Design and Location of Rights of Way and Transmission Facilities" or any other successor guidelines and any other applicable federal guidelines; and (E) in the case of an electric or fuel transmission line, that the location of the line will not pose an undue hazard to persons or

property along the area traversed by the line. For purposes of subparagraph (A) of this subdivision, a public benefit exists if such a facility is necessary for the reliability of the electric power supply of the state or for the development of a competitive market for electricity.

**\*10** This issue is not an environmental one. Instead, it focuses on the reliability of the electric power supply and the development of a competitive market for electricity. The Siting Council's extensive findings on the issue of public benefit do not mention the environment. (ROR, Findings of Fact, pp. 3-5, ¶¶ 13-24.)

As the Attorney General agreed at oral argument, the Siting Council should not consider environmental consequences in assessing public benefit but rather should determine the public benefit separately and then weigh it against the environmental consequences. The statute provides as much. Subparagraph (c)(2)(A) requires the Siting Council to find and determine public benefit. Environmental impact is a separate factor, contained in the next subparagraph, General Statutes § 16-50p(c)(2)(B). Subparagraph (B) refers to "the nature of the probable environmental impact, including a specification of every single adverse and beneficial effect that, whether alone or cumulatively with other effects, conflict with the policies of the state concerning the natural environment, ecological balance, public health and safety, scenic, historic and recreational values, forests and parks, air and purity and fish and wildlife." The next subparagraph, § 16-50p(c)(2)(C) , requires the Siting Council to determine "why the adverse effects or conflicts referred to in subparagraph (B) of this subdivision are not sufficient reason to deny the application." This subparagraph obligates the Siting Council to weigh the environmental impact against the benefits. Thus, while the Siting Council must consider the environmental impact and weigh that impact against the public benefit in subparagraphs (B) and (C), the validity of the Siting Council's finding of public benefit under subparagraph (A) is not in itself an environmental issue. Therefore, the Attorney General does not have authority under § 22a-19 to raise the public benefit issue on appeal . [FN17]

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
33 Conn. L. Rptr. 187
(Cite as: 2002 WL 31126293 (Conn.Super.))

Page 11

FN17. In the April 9, 2002 Ruling on Applications for Stay Pending Decision, the court considered the merits of the public benefit argument for the limited purpose of deciding whether the plaintiffs were likely to succeed on appeal. See *Griffin Hospital v. Commission on Hospitals & Health Care,* 196 Conn. 451, 458-59, 493 A.2d 229 (1985). The court did not address jurisdictional arguments at that time. Instead, the court indicated in a subsequent scheduling order that it would consider jurisdictional arguments along with the merits. The court has now concluded that no party has standing to raise the public benefit issue and therefore the court does not address this issue on its merits.

## V

The court accordingly turns to the merits of the environmental issues. The Attorney General's principal contention is that the Siting Council erred in failing to consider the cumulative impact of some five other proposed gas or electric transmission projects planned for construction under Long Island Sound. The Attorney General claims that this failure violates the terms of the governing Siting Council statute, General Statutes § 16-50p(c)(2), and CEPA.

This issue involves a pure question of law and thus this court has broad review. See *MacDermid, Inc. v. Department of Environmental Protection,* 257 Conn. 128, 137, 778 A.2d 7 (2001). Because the Siting Council's interpretation of the relevant statutes as not requiring an inquiry into the impact of other proposed projects has not been subject to judicial scrutiny, the agency is not entitled to special deference. *Id.*

To resolve this issue, the court must engage in statutory interpretation. The process of statutory interpretation "involves a reasoned search for the intention of the legislature ... In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common-las principles governing the same general subject matter."

(Internal quotation marks omitted.) *Connelly v. Commissioner of Correction,* 258 Conn. 394, 403, 780 A.2d 903 (2001).

**\*11** Both defendants interpret § 16-50p(c)(2) to require only an examination of the cumulative environmental impact from the project under consideration. As discussed, § 16-50p(c)(2) provides that the Siting Council "shall not grant a certificate for *a* facility ... which is substantially underground or underwater" unless the Siting Council makes a number of findings, including:

the nature of the probable environmental impact, including a specification of every single adverse and beneficial effect that, whether alone or cumulatively with other effects, conflict with the policies of the state concerning the natural environment, ecological balance, public health and safety, scenic, historic and recreational values, forests and parks, air and purity and fish and wildlife ...

(Emphasis added.) General Statutes § 16-50p(c)(2)(B). See *supra* note 16. The plain language of this provision establishes that, contrary to the Attorney General's arguments, the Siting Council must examine the environmental effects "alone or cumulatively" of "a facility" seeking the certificate, not of other facilities seeking or planning to seek certificates. Although, as the Attorney General maintains, this statute may be a remedial one and thus should be interpreted liberally, the court simply cannot expand the statute beyond the words of the statute itself. *Connelly v. Commissioner of Correction, supra,* 258 Conn. at 403.

The defendants' interpretation furthers a reasonable legislative policy. *Connelly v. Commissioner of Correction, supra,* 258 Conn. at 403. It is entirely logical for an agency to consider only the environmental impact of the proposal before it, and then take that impact into account when evaluating subsequent proposals. See *Kleppe v. Sierra Club,* 427 U.S. 390, 414-15 n. 26 (1976). The alternative approach advocated by the Attorney General might result in the denial of an application based on the cumulative environmental impact of future projects even though the project in question would do minimal environmental harm and confer considerable public benefit.

An examination of the surrounding legislation

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
33 Conn. L. Rptr. 187
(Cite as: 2002 WL 31126293 (Conn.Super.))

Page 12

supports the defendants' interpretation of the statute. *Connelly v. Commissioner of Correction, supra,* 258 Conn. at 403. In General Statutes § 16-50l(a)(1) , the legislature has required that an application for a certificate for an electric transmission line contain a number of very specific types of information. [FN18] One of the requirements is "a description of the effect of *the* proposed transmission line, substation or switchyard on the environment, ecology, and scenic, historic and recreational values ..." (Emphasis added.) General Statutes § 16-50l(a)(1)(E). Despite the very specific requirements of the statute, there is no requirement to identify the environmental effects of similar proposed transmission lines. The legislature's mandate that an applicant identify the environmental effects of its proposal but not of other related proposals reveals a legislative intention not to compel the Siting Council to consider the related proposals. [FN19]

> FN18. In pertinent part, § 16-50l(a)(1) requires:
> (A) A description, including estimated costs, of the proposed transmission line, substation or switchyard, covering, where applicable underground cable sizes and specifications, overhead tower design and appearance and heights, if any, conductor sizes, and initial and ultimate voltages and capacities; (B) a statement and full explanation of why the proposed transmission line, substation or switchyard is necessary and how the facility conforms to a long-range plan for expansion of the electric power grid serving the state and interconnected utility systems, that will serve the public need for adequate, reliable and economic service; (C) a map of suitable scale of the proposed routing or site, showing details of the rights-of-way or site in the vicinity of settled areas, parks, recreational areas and scenic areas, and showing existing transmission lines within one mile of the proposed route or site; (D) justification for adoption of the route or site selected, including comparison with alternative routes or sites which are environmentally, technically and economically practical; (E) a description of the effect of the proposed transmission

line, substation or switchyard on the environment, ecology, and scenic, historic and recreational values; (F) a justification for overhead portions, if any, including life-cycle cost studies comparing overhead alternatives with underground alternatives, and effects described in subdivision (E) of undergrounding; (G) a schedule of dates showing the proposed program of right-of-way or property acquisition, construction, completion and operation; and (H) identification of each federal, state, regional, district and municipal agency with which proposed route or site reviews have been undertaken, including a copy of each written agency position on such route or site.

> FN19. The statutory scheme nonetheless insures that the Siting Council does not act myopically. The Siting Council consists of nine members with differing backgrounds and expertise. See General Statutes § 16-50j(b). Prior to commencing any hearing, the Siting Council must consult with various state agencies, including the Department of Environmental Protection. See General Statutes § 16-50j(h); *Town of Preston v. Connecticut Siting Council,* 20 Conn.App. 474, 491, 568 A.2d 799, cert. denied, 214 Conn. 803, 573 A .2d 316 (1990). The council shall also "give such consideration to other state laws and municipal regulations as it shall deem appropriate." General Statutes § 16-50x(a).

**\*12** The passage of Public Acts 2002, No. 02-95 during the pendency of this case also sheds light on the meaning of § 16-50p(c)(2). Sections 1 and 3 of the public act provide for the formation of a task force to complete, within one year, a comprehensive environmental assessment and plan concerning numerous items including: "an evaluation of methods to minimize the numbers and impacts of electric power line crossings, gas pipeline crossings and telecommunications crossings within Long Island Sound, including an evaluation of the individual and cumulative environmental impacts of any such proposed crossings ..." Public Acts 2002, No. 02-95, § 3. Section 4 requires that, after a

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
33 Conn. L. Rptr. 187
(Cite as: 2002 WL 31126293 (Conn.Super.))

Page 13

one-year moratorium (provided for in sections 1 and 3), any state agency, including the Siting Council, considering an application for an electric power line, gas pipeline or telecommunications crossing of Long Island Sound shall evaluate a number of factors, including: "environmental impact, both individual and cumulative, including but not limited to those impacts anticipated by the comprehensive environmental assessment and plan described in section 3 of this act." Public Acts 2002, No. 02-95, § 4. [FN20]

FN20. In full, Section 4 provides:
Any application for an electric power line, gas pipeline or telecommunications crossing of Long Island Sound that is considered by any state agency, including, but not limited to, the Department of Environmental Protection or the Connecticut Siting Council, after the creation of the comprehensive environmental assessment and plan, described in section 3 of this act, shall additionally be evaluated for such application's: (1) Likelihood to impair the public trust in Long Island Sound based on, but not limited to, the information contained in the comprehensive environmental assessment and plan; (2) consistency with the recommendations of the comprehensive environmental assessment; and (3) environmental impact, both individual and cumulative, including but not limited to those impacts anticipated by the comprehensive environmental assessment and plan described in section 3 of this act.

The wording in the new public act, particularly the language in section 3 requiring "an evaluation of the individual and cumulative environmental *impacts* of any such proposed *crossings,*" clearly refers to the cumulative environmental impact analysis proposed by the Attorney General. (Emphasis added.) Public Acts 2002, No. 02-95, § 3. This new language stands in contrast to the language in § 16-50p(c)(2)(B) requiring the Siting Council, in considering the application for "a facility," to determine the "nature of the probable environmental impact, including a specification of every single

adverse and beneficial effect that, whether alone or cumulatively with other effects, conflict with the policies of the state concerning the natural environment ..."

The presumption is that the new language represents a change in the law, rather than a clarification of prior law. See *State v. State Employees' Review Board,* 239 Conn. 638, 648, 687 A.2d 134 (1997). This presumption is well-founded here. The public act, entitled "An Act Concerning the Protection of Long Island Sound," does not purport to clarify or even amend § 16-50p, but rather enacts an entirely new statute. The language of section 4 of the public act does not track the language of § 16-50p(c)(2), but rather refers to review by any state agency ("including, but not limited to, the Department of Environmental Protection or the Connecticut Siting Council") of specific types of facilities ("electric power line, gas pipeline or telecommunications crossing") in a specific location (Long Island Sound). Section 4 adds a requirement that the Siting Council consider a comprehensive environmental assessment and plan--a requirement that did not exist under prior law. For these reasons, the court concludes that Public Acts 2002, No. 02-95 represents a change in rather than a clarification of prior law and, therefore, that the prior law, § 16-50p(c)(2), does not require the Siting Council to examine the cumulative environmental impact of future projects.

*13 The Attorney General next contends that CEPA applies in Siting Council proceedings and requires an examination of cumulative environmental impact. The court's initial response is that a conflict exists between CEPA, as construed by the Attorney General, and § 16-50p(c)(2), and that the Siting Council statute takes precedence.

Statutes governing the Siting Council are found in chapter 277a of the General Statutes, which is entitled "Public Utility Environmental Standards Act," and which encompasses §§ 16-50g through 16-50aa. General Statutes § 16-50w provides: "In the event of any conflict between the provisions of this chapter and any provisions of the general statutes, as amended, or any special act, this chapter shall take precedence."

Our Supreme Court has stated that:
  A test frequently used to determine whether a

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                                    Page 14
33 Conn. L. Rptr. 187
**(Cite as: 2002 WL 31126293 (Conn.Super.))**

conflict exists is whether the ordinance permits or licenses that which the statute forbids, or prohibits that which the statute authorizes; if so, there is a conflict. If, however, both the statute and the ordinance are prohibitory and the only difference is that the ordinance goes further in its prohibition than the statute, but not counter to the prohibition in the statute, and the ordinance does not attempt to authorize that which the legislature has forbidden, or forbid that which the legislature has expressly authorized, there is no conflict. (Internal quotation marks omitted.) *Bauer v. Waste Management of Connecticut, Inc.,* 234 Conn. 221, 235, 662 A.2d 1179 (1995). [FN21] In this case, § 16-50p(c)(2) requires the Siting Council to grant a certificate when it finds the required statutory factors. See *supra* note 16. [FN22] These factors, as the court has held, do not include an examination of the cumulative environmental impact of future projects. In contrast, CEPA, in the Attorney General's view, requires the agency to assess the cumulative future environmental impact. In a given case, in which consideration of cumulative environmental impact is the decisive factor, § 16-50p(c)(2) could permit what, according to the Attorney General, CEPA forbids. Accordingly, a conflict exists. *Bauer v. Waste Management of Connecticut, supra,* at 235. In this situation, the Siting Council statute "takes precedence." General Statutes § 16-50w. Thus, while the Siting Council may have discretion to consider CEPA, see General Statutes § 16-50x(a); *supra* note 19, it is not required to do so.

> FN21. Although this test refers to a conflict between an ordinance and a statute, the Attorney General relies on this test to resolve the conflict between the two statutes at issue.

> FN22. The Attorney General claims that the Siting Council has discretion to deny a certificate even if the applicant satisfies the statutory factors. The Assistant Attorney General for the Siting Council, however, represented at oral argument that the Siting Council would not have that authority. Although the statute is not entirely clear, the court credits the Siting Council's concession concerning the limits of its own

powers. The court cannot envision any basis for the Siting Council to deny an application that meets the statutory test.

The court, in any event, does not agree with the Attorney General's interpretation of CEPA. The Attorney General relies primarily on the underscored language in § 22a 19(b), which provides:

> In any administrative, licensing or other proceeding, the agency shall consider the alleged unreasonable pollution, impairment or destruction of the public trust in the air, water or other natural resources of the state and no conduct shall be authorized or approved which does, or is reasonably likely to, have such effect so long as, *considering all relevant surrounding circumstances and factors, there is a feasible and prudent alternative* consistent with the reasonable requirements of the public health, safety and welfare.

**\*14** (Emphasis added.) General Statutes § 22a-19(b). The Attorney General claims that "all relevant circumstances" encompasses cumulative environmental impact. Our courts, however, have not interpreted this language to require an examination of future sources of pollution. Further, in *Paige v. Town Plan & Zoning Commission,* 235 Conn. 448, 462-63, 668 A.2d 340 (1995), the Supreme Court observed: "By its plain terms, General Statutes § 22a- 19(b) requires the consideration of alternative plans *only* where the commission first determines that it is *reasonably likely* that the project would cause *unreasonable pollution, impairment or destruction of the public trust* in the natural resource at issue." (Emphasis in original; internal quotation marks omitted.) This observation confirms that § 22a-19(b) contains two prongs: unreasonable pollution and feasible alternative plans. By its placement in the statute, the language "all relevant circumstances and factors" modifies the feasible alternatives prong. It thus qualifies what is a "feasible alternative." It follows that the phrase "all relevant circumstances and factors" does not modify the initial determination of whether there is "unreasonable pollution." Indeed, the latter phrase already contains a reasonableness component. Thus, even assuming that CEPA applies to the Siting Council, the phrase "all relevant circumstances and factors" does not affect the initial inquiry into whether there is unreasonable pollution.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
33 Conn. L. Rptr. 187
(Cite as: 2002 WL 31126293 (Conn.Super.))

Page 15

The Attorney General also relies on language in § 22a-16 that the Attorney General may bring an action for "declaratory and equitable relief" when a person "acting alone, or in combination with others" has impaired the environment. General Statutes § 22a-16. [FN23] The initial barrier to application of this provision is that this case is an administrative appeal, not one for declaratory or equitable relief. The Attorney General's response is to rely on the Appellate Court's statement in *Hyllen Davey v. Plan & Zoning Commission, supra,* 57 Conn.App. at 593, that it views §§ 22a-16 and 22a- 19 "as operating hand in hand to grant a full range of protection to our state's environmental resources." The point of this statement was that, because each statute authorizes "any person" to invoke its remedies, and because both statutes were part of a common legislative effort, both statutes should be interpreted similarly to have eliminated the requirement of classical aggrievement. *Id.,* at 591-95. The decision, however, does not mean that courts are free to overlook the wording in one statute when it is different from the other or because doing so might promote the environment. See *Quarry Knoll II Cow. v. Planning & Zoning Commission,* 256 Conn. 674, 735-36, 780 A.2d 1 (2001). Indeed, in *Hyllen Davey,* the Appellate Court relied on the plain language of § 22a-19, without reference to § 22a-16 , to rule that a person who was not a party in an administrative proceeding may intervene in a pending administrative appeal but cannot take an appeal on its own. Accordingly, the court finds that, because this case is not an action for declaratory or equitable relief, § 22a-16 does not apply. [FN24]

FN23. In full, § 22a-16 provides:
The Attorney General, any political subdivision of the state, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity may maintain an action in the superior court for the judicial district wherein the defendant is located, resides or conducts business, except that where the state is the defendant, such action shall be brought in the judicial district of Hartford, for declaratory and equitable relief against the state, any political subdivision thereof, any instrumentality or agency of the state or of

a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity, acting alone, or in combination with others, for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction provided no such action shall be maintained against the state for pollution of real property acquired by the state under subsection (e) of section 22a-133m, where the spill or discharge which caused the pollution occurred prior to the acquisition of the property by the state.

FN24. Because the court concludes that CEPA generally, and § 22a- 16 in particular, does not apply to this case, the court need not reach the question of whether "in combination with others" in § 22a-16 requires an examination of future sources of pollution from other projects that are awaiting approval. The court adds only that *Manchester Environmental Coalition v. Stockton,* 184 Conn. 51, 441 A.2d 68 (1981), relied on by both sides, does not clearly resolve this question. The decision merely restates that the defendant's pollution should be considered "in combination with others," *id.,* at 60, or in combination with "air pollution in Connecticut," *id.,* at 60 n. 11, without specifying whether the focus is on the present or the future.

*15 Finally, the Attorney General contends that federal cases decided under the National Environmental Protection Act, 42 U.S.C. § 4321 et seq. ("NEPA"), require environmental impact statements to include a cumulative impact analysis and that this rule either applies directly to the Siting Council or indirectly through CEPA. [FN25] The Attorney General tries to tie NEPA directly into Siting Council proceedings through the introductory statute in the Public Utility Environmental Standards Act, which provides that one of the many "purposes of this chapter" is to "provide environmental quality standards and criteria for the location, design, construction and operation of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
33 Conn. L. Rptr. 187
**(Cite as: 2002 WL 31126293 (Conn.Super.))**

facilities for the furnishing of public utility services at least as stringent as the federal environmental quality standards and criteria ..." General Statutes § 16-50g. [FN26] This introductory statement appears to be more of a description of what the remainder of the state statutes in the chapter seek to do than a wholesale incorporation of federal environmental law. Surely, the Attorney General does not contend that § 16-50g makes applicable to Siting Council proceedings every regulation of the federal Council on Environmental Quality and the Environmental Protection Agency regarding "federal environmental quality standards and criteria."

FN25. Although our Supreme Court has relied on federal cases for guidance in determining the meaning of CEPA, see *Manchester Environmental Coalition v. Stockton, supra,* 184 Conn. at 61-63, the Attorney General does not explain what sections or phrases of CEPA and NEPA the court should construe similarly. In any event, the court has held that CEPA cannot mandate a different result than the one that the Siting Council has reached. Therefore, it is unnecessary to consider the CEPA claim further.

FN26. In full, § 16-50g provides:
The legislature finds that power generating plants and transmission lines for electricity and fuels, community antenna television towers and telecommunication towers have had a significant impact on the environment and ecology of the state of Connecticut; and that continued operation and development of such power plants, lines and towers, if not properly planned and controlled, could adversely affect the quality of the environment, the ecological, scenic, historic and recreational values of the state. The purposes of this chapter are: To provide for the balancing of the need for adequate and reliable public utility services at the lowest reasonable cost to consumers with the need to protect the environment and ecology of the state and to minimize damage to scenic, historic, and recreational values; to provide environmental quality standards and

criteria for the location, design, construction and operation of facilities for the furnishing of public utility services at least as stringent as the federal environmental quality standards and criteria, and technically sufficient to assure the welfare and protection of the people of the state; to encourage research to develop new and improved methods of generating, storing and transmitting electricity and fuel and of transmitting and receiving television and telecommunications with minimal damage to the environment and other values described above; to promote the sharing of towers for fair consideration wherever technically, legally, environmentally and economically feasible to avoid the unnecessary proliferation of towers in the state particularly where installation of such towers would adversely impact class I and II watershed lands, and aquifers; to require annual forecasts of the demand for electric power, together with identification and advance planning of the facilities needed to supply that demand and to facilitate local, regional, state-wide and interstate planning to implement the foregoing purposes.

In any case, the requirement of a federal environmental impact statement is one that applies to "major Federal actions significantly affecting the quality of the human environment." 42 U .S.C. § 4332(2)(C). It does not apply when, as here, there is neither federal funding nor federal control. See *Enos v. March,* 769 F.2d 1363, 1371-72 (9th Cir.1985). [FN27] Thus, even if § 16- 50g incorporated all "federal environmental quality standards and criteria," the federal environmental impact statement standards and criteria relied upon by the Attorney General do not govern private actors such as Cross-Sound.

FN27. There is no dispute that Cross-Sound is a purely private entity. (ROR, Findings of Fact, p. 1, ¶ 3.) The court adds that, even under the state Environmental Policy Act, General Statutes §§ 22a-1 to 22a- 1h, which is separate and distinct from CEPA, see

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
33 Conn. L. Rptr. 187
**(Cite as: 2002 WL 31126293 (Conn.Super.))**

*Manchester Environmental Coalition v. Stockton, supra,* 184 Conn. at 63, the obligation to make a "detailed written evaluation of ... environmental impact," General Statutes § 22a-1b(b), applies only to "activities proposed to be undertaken by state departments, institutions or agencies, or funded in whole or in part by the state ..." General Statutes § 22a-1c.

## VI

The Attorney General makes a separate argument that the Siting Council failed to consider feasible and prudent alternatives to the project as required by § 22a-19(b). The court reiterates that CEPA does not apply to Siting Council proceedings when it conflicts with the Public Utility Environmental Standards Act, as the Attorney General suggests it does. Moreover, the Attorney General improperly relies on language in *Gardiner v. Conservation Commission,* 222 Conn. 98, 109, 608 A.2d 672 (1992), that "[e]ven minimal environmental harm is to be avoided if, 'considering all relevant surrounding circumstances and factors, there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety and welfare.' " Three years later, in *Paige v. Town Plan & Zoning Commission, supra,* 235 Conn. at 448, the Supreme Court, as quoted above, clarified that § 22a-19(b) requires the consideration of alternative plans only when the agency first determines that the project would cause " *unreasonable pollution* ..." (Emphasis in original; internal quotation marks omitted.) *Id.,* at 462-63. The Supreme Court has adhered to the rule that there is no need to consider alternative plans unless the agency first finds "unreasonable" pollution. See *Quarry Knoll II Corp. v. Planning & Zoning Commission, supra,* 256 Conn. at 736 n. 33. In this case, the Siting Council, without applying CEPA, essentially found that there was no unreasonable pollution. See *supra* note 2. Because, aside from the cumulative impact argument, the Attorney General in this appeal does not challenge this finding, the Siting Council had no obligation under CEPA, even if it applied, to examine alternative routes or projects.

*16 The court also observes that the Siting Council did undertake an examination of alternative routes.

By law, an applicant for a certificate must provide the Siting Council with "justification for adoption of the route or site selected, including comparison with alternative routes or sites which are environmentally, technically and economically practical." General Statutes § 16-50l(a)(1)(D). In this case, as discussed, the Siting Council initially rejected, partly on environmental grounds, an application from a predecessor of Cross-Sound that proposed a different route for the cable. The Siting Council found that the relocated route it ultimately approved "will result in substantially less impact to important shellfish seed beds." (ROR, Opinion, p. 3.) Thus, the Siting Council complied with the spirit of CEPA, even if the letter did not apply.

## VI

The appeals are dismissed.

2002 WL 31126293 (Conn.Super.), 33 Conn. L. Rptr. 187

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing Memorandum of Law in Opposition to

Defendant's Motion to Stay was sent by facsimile (without exhibits) and by Federal Express

(with exhibits), this 27th day of October 2003, to the following counsel of record:

>
> Robert F. Maslan, Jr.
> Mark R. Carta
> Rucci, Burnham, Carta & Edelberg, L.L.P.
> 30 Old King's Highway South
> P.O. Box 1107
> Darien, CT 06820

Brian O'Donnell