LEXSEE 1994 U.S. APP. LEXIS 36785

**WILFRED HART, Plaintiff, Appellant, v. UNITED STATES OF AMERICA, Defendant, Appellee.**

No. 94-1604

**UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**

**1994 U.S. App. LEXIS 36785**

**December 30, 1994, Decided**

**NOTICE:** [*1] RULES OF THE FIRST CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: 43 F.3d 1456, 1994 U.S. App. LEXIS 39658.

**PRIOR HISTORY:** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE. Hon. Morton A. Brody, U.S. District Judge.

**COUNSEL:** Wilfred Hart, Jr., on brief pro se.

Jay P. McCloskey, United States Attorney, and Margaret D. McGaughey, Assistant United States Attorney, on brief for appellee.

**JUDGES:** Before Torruella, Chief Judge, Bownes, Senior Circuit Judge, and Stahl, Circuit Judge.

**OPINIONBY:** PER CURIAM

**OPINION:** Per Curiam. Plaintiff-appellant Wilfred Hart, Jr. has appealed from a district court order denying him leave to file a motion to dissolve a district court injunction barring him from certain filings without leave of court. We affirm the district court's ruling.

On June 23, 1992, the district court entered the following injunction against Hart:

It is hereby ORDERED that Wilfred Hart is enjoined from filing any motions, pleadings or papers of whatever type or description in the District of Maine, in connection with his 1988 conviction for controlled substance violations without prior leave of Court. Hart may seek leave of Court by [*2] filing a summary of the claims he seeks to raise (not to exceed one page per claim) together with an affidavit certifying that the claims are novel and have not previously been raised before this Court or any other federal court. Upon failure to so certify or failure to so certify truthfully, Hart may be found in contempt of court and punished accordingly.

The injunction was issued in response to what the district court described as Hart's "frivolous motions and duplicative pleadings which encroach on the Court's limited time and resources, . . . which can only be calculated to disrupt the orderly consideration of cases, . . . and which merely restate claims which have already made [sic] and which have been denied."

Hart appealed the injunction to this court, challenging its legality and constitutionality on a number of grounds, including vagueness. On March 21, 1994, this court rejected all of Hart's challenges, and affirmed the injunction. Hart v. United States, 1994 U.S. App. LEXIS 5169, nos. 92-1801, 92-2292, 92-2449 (1st Cir. 3/21/94) (unpublished). We stated that we would "leave the construction of the injunction to the district court in the first instance." Id. at *6.

On May 20, [*3] 1994, Hart filed a motion for leave of court to file an accompanying motion for a three-judge panel to dissolve the injunction. The underlying motion to dissolve argued that the district court's "operative construction" of the injunction was so narrow as to unconstitutionally limit Hart's access to the courts. On the same day, the district court denied the motion for leave of court, endorsing it as follows: "Claim has previously been raised and is therefore not novel." Hart appeals.

On the surface, it would seem that in his May 20 motion Hart did seek to raise an issue not raised in his appeal. The appeal upheld the facial terms of the injunction, whereas Hart's May 20 motion seems to challenge the constitutionality of the manner in which the district court has later construed and applied the injunction. In fact, however, Hart's motion fails to specify in what way the district court should be thought to have applied the

injunction in an unconstitutional manner. Hart's motion, therefore, appears to be, in substance, nothing more than another attack on the terms of the injunction. Such an attack is not novel, having already been mounted in Hart's prior appeal.

In any event, even if [*4] Hart's motion were to be regarded as raising a novel claim, we would affirm its dismissal on the ground that it was frivolous. Insofar as Hart's motion once again challenges the terms of the injunction, res judicata bars any relief by virtue of our prior ruling. Insofar as the motion does assert that the injunction has been applied in an unconstitutional manner, the motion provides no basis for such a conclusion. Any challenge to the injunction's application, moreover, should properly be raised in conjunction with the particular matter to which the injunction allegedly has been improperly applied. Finally, the motion's request that a three-judge court be convened to consider the matter is frivolous.

The ruling of the district court is affirmed.

LEXSEE 2003 U.S. DIST. LEXIS 16643

**MM Global Servs. v. Dow Chem. Co.**

Civil No. 3:02cv 1107 (AVC)

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

**2003 U.S. Dist. LEXIS 16643; 2003-2 Trade Cas. (CCH) P74,164**

**September 12, 2003, Filed**

**DISPOSITION:** Defendants' motions to dismiss were granted in part and denied in part.

**LexisNexis (TM) HEADNOTES- Core Concepts:**

**COUNSEL:** [*1] For MM Global Svc Inc, MM Global Svc PTE LTd, Megavisa Solutions (S) PTE Ltd, PLAINTIFFS: Stephen B Harris, Robert M Langer, Wiggin & Dana, New Haven, CT USA. Richard S Taffet, Susan B McInerney, Michael S Elkin, Suzanne Ellen Wachsstock, Thelen Reid & Priest, New York, NY USA.

For Dow Chemical Co, Union Carbide Corp, DEFENDANT: Craig Raabe, Edward J Heath, Elizabeth A Fowler, Robinson & Cole, Hartford, CT USA. Mark P Edwards, Morgan, Lewis & Bockius LLP, Philadelphia, PA USA. William L Webber, Morgan, Lewis & Bockius, Washington, DC USA.

**JUDGES:** Alfred V. Covello, United States District Judge.

**OPINIONBY:** Alfred V. Covello

**OPINION:**

RULING ON THE DEFENDANTS' MOTIONS TO DISMISS

This is an action for damages arising out of a business arrangement pursuant to which the plaintiffs purchased chemicals, polymers, and other products from the defendants and resold them to customers located in India. The amended complaint alleges violations of the Sherman Antitrust Act, 15 U.S.C. § 1, the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-26 and 28(a), the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b, and common law tenets concerning breach [*2] of contract, breach of the implied covenant of good faith and fair dealing, fraudulent misrepresentation and non-disclosure, negligent misrepresentation, tortious interference with business expectancies, tortious interference with contractual relationships, and unfair competition.

The defendants, Dow Chemical Company and Union Carbide Corporation, now move pursuant to Federal Rule of Civil Procedure 12(b)(1) to dismiss the federal antitrust claim for want of subject matter jurisdiction. The defendants also move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the amended complaint in its entirety for failure to state a claim upon which relief can be granted.

The issues presented are: 1) whether the court has subject matter jurisdiction to adjudicate the claimed violation of the Sherman Antitrust Act, 15 U.S.C. § 1; 2) the choice of law to be applied to the claim of breach of contract and the claim of breach of the implied covenant of good faith and fair dealing; 3) whether the amended complaint states a cause of action for breach of contract; 4) the choice of law to be applied to the claim of tortious interference with business expectancies, tortious [*3] interference with contractual relationships, unfair competition, fraudulent misrepresentation, negligent misrepresentation, violations of the Connecticut Unfair Trade Practices Act, and violations of the Connecticut Antitrust Act; and 5) whether the amended complaint states a cause of action for fraudulent misrepresentation and negligent misrepresentation.

For the reasons hereinafter set forth, the court concludes: 1) the court has subject matter jurisdiction to adjudicate the claimed violation of the Sherman Antitrust Act, 15 U.S.C. § 1; 2) the law of Singapore governs the breach of contract claims and, because Singapore does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing, that claim is dismissed; 3) the amended complaint alleges with adequate particularity a cause of action for breach of contract; 4) the law of India governs the tort claims and, because that country does not recognize a cause of action for tortious interference with business expectancies, tortious interference with contractual relationships or unfair compe-

Case 3:03-cv-00900-AWT   Document 24-3   Filed 11/12/2003   Page 4 of 18

Page 2

2003 U.S. Dist. LEXIS 16643, *3; 2003-2 Trade Cas. (CCH) P74,164

tition, those claims are also dismissed. Further, because the claimed violations of the [*4] Connecticut Unfair Trade Practices Act and the Connecticut Antitrust Act are also governed by the law of India, and India does not have a similar basis for relief, those claims are dismissed as well. Finally, the court concludes that: 5) the amended complaint fails to state a claim for fraudulent misrepresentation, but sets forth with adequate particularity a claim for negligent misrepresentation. The motion to dismiss the antitrust claim for want of subject matter jurisdiction is therefore DEMIED. The motion to dismiss the amended complaint for failure to state a claim is GRANTED in part and DENIED in part.

**FACTS**

Examination of the amended complaint and supplemental documents, including affidavits and exhibits submitted in connection with the instant motion, set forth the following material facts. The defendant, Union Carbide Corporation ("Union Carbide") is engaged in the manufacture and sale of chemicals, polymers, and other specialty products to customers located in the United States and throughout the world. It is incorporated in New York with its corporate headquarters and principal place of business located in Danbury, Connecticut.

In December 1984, lethal gas escaped [*5] from Union Carbide's plant in Bhopal, India. The leak caused the death of 3,800 persons and injuries to an additional 200,000. In February 1989, Union Carbide and its Indian affiliate were ordered to pay a total of $470 million for all civil claims arising from the tragedy.

In the aftermath of this tragedy, Union Carbide ceased selling products directly to customers in India and, in 1987, Union Carbide, through its subsidiary, Union Carbide Eastern, Inc. ("UCE"), appointed the plaintiff, Mega Vista Marketing Solutions Ltd. ("MVMS") as a non-exclusive distributor to maintain Union Carbide's access to the Indian marketplace. MVMS n1 is an Indian corporation, having its principal place of business in Mumbai, India.

The relationship between Union Carbide and MVMS was memorialized in a letter agreement dated November 16, 1987 ("the 1987 letter agreement"). As stated therein, Union Carbide appointed MVMS as a "non-exclusive distributor/indentor in India" for Union Carbide products. MVMS agreed to "canvas and promote" the products, and to establish contact with potential customers in India on behalf of Union Carbide. UCE did not grant MVMS authority to accept any order from any prospective [*6] customer or to undertake any act that would bind Union Carbide under a contract of sale or otherwise. Further, under the 1987 letter agreement, Union Carbide agreed to pay MVMS a commission on all sales arranged by MVMS in India. Union Carbide had the right to terminate the 1987 letter agreement in its sole discretion on ninety days written notice.

   n1  MVMS was then known as Visa Petrochemcials Pvt. Ltd.

In 1993, Union Carbide requested that MVMS form separate corporate affiliates and open offices outside India that would buy Union Carbide products in the United States and resell them to endusers in India. MVMS complied with the request, and formed the plaintiff, Mega Global Services, Inc. ("MMGS") a Texas corporation with a principal place of business in Houston. MVMS also formed the plaintiff, Mega Global Services, Inc. - Singapore ("MMGS-S"), a business entity organized under the laws of Singapore with a principal places of business in that country. In addition, Union Carbide formed the defendant, Union Carbide [*7] Asia Pacific, Inc. ("UCAP") and the defendant, Union Carbide Customer Services Pte Ltd ("UCCS") to assist product sales in India. UCAP is a corporation organized under the laws of Delaware with a principal place of business in Singapore. UCCS is a corporation organized under the laws of Singapore with a principal place of business in that country.

Thereafter, on April 5, 1993, Union Carbide, acting through UCAP, terminated the 1987 letter agreement with MVMS and, on the same day, UCAP confirmed its agreement to sell products to MMGS by way of another letter agreement ("the 1993 letter agreement"). Under the 1993 letter agreement, MMGS succeeded MVMS as the non-exclusive distributor of Union Carbide products in India. As with MVMS, MMGS purchased products from UCAP, with title and risk of loss passing to MMGS in the United States, and MMGS then resold the products from the United States to end-users in India. Terms relating to volume, specifications, price, payment and delivery were set forth in transactional documents relating to specific orders, including purchase orders, invoices, order acknowledgments and shipping receipts.

During the period of 1993 through 2000, MMGS-S intermittently [*8] purchased products from Union Carbide in the United States under the same terms and conditions as established between UCAP and MMGS. The orders were processed in the United States and MMGS-S made payments for and took title to the products in the United States through banking channels set up with Union Carbide. n2

   n2  The defendants maintain that, to the

Case 3:03-cv-00900-AWT   Document 24-3   Filed 11/12/2003   Page 5 of 18

Page 3

2003 U.S. Dist. LEXIS 16643, *8; 2003-2 Trade Cas. (CCH) P74,164

contrary, MMGS-S paid for the products in Singapore.

On September 8, 1995, UCAP and MMGS reaffirmed their relationship by way of a new letter agreement ("the 1995 letter agreement") with UCAP sending the letter from Singapore to MMGS's offices in Texas. The letter stated:

> This is to confirm Union Carbide's interest in selling to MM Global Services Inc. (MMGS) from time to time effective as of 8th September, 1995, certain of Union Carbide's products for resale by MMGS to customers located in India.
>
> Each such sale, of course, would be contingent upon the continuing interest of MMGS and Union Carbide and a mutual agreement on specific terms including [*9] volume, specifications, price, payment and delivery. However, certain aspects of our dealings should be consistent such as the following:
>
> – Unless otherwise specified by the parties, all shipments under this contract shall be made on MMGS's behalf and in MMGS's name as shipper. MMGS shall have title to product and shall bear all risks associated with product from the time when product has effectively passed the ship's rail at the point of shipment.
>
> – Unless otherwise requested by MMGS, Union Carbide will arrange ocean transportation with its usual carriers. The issue as to which party bears the cost of such transportation shall be negotiated on a case by case basis.
>
> – MMGS purchase price will customarily include a mutually acceptable reseller's discount that will be established based on the product, volumes, etc.
>
> – MMGS will consign and sell all the products, as supplied by Union Carbide Corporation, only to the customers in India and not to customers in any other country in the world. If MMGS sells any of these products in any countries outside India, the Distributorship arrangement with MMGS will forthright be terminated without any notice.
>
> We recognize [*10] that there may be instances when it is more economical or otherwise efficient for MMGS to purchase products from the stock of the appropriate Union Carbide affiliate in the Asia/Pacific region such as Union Carbide Asia Limited in Hong Kong. In such cases, Union Carbide will recommend to its affiliate that it follow the same protocol set forth in this letter.
>
> There also may be instances where Union Carbide will elect not to sell MMGS a given product when Union Carbide is not satisfied as to its appropriateness from a health and safety standpoint due to the sophistication of the market, the product and/or the ultimate customer. However, we trust that we will be in agreement on the vase majority of such instances.
>
> We sincerely look forward to developing a mutually beneficial relationship in the days ahead.

In 1998, at Union Carbide's direction, MMGS assigned all of its rights and duties under the 1995 letter agreement to MMGS-S. MMGS-S thereafter assumed all purchasing of the products for end-users in India. The purchases continued to be made by Union Carbide in the United States, and MMGS-S made payments in Singapore. Delivery of the products occurred in the Gulf [*11] states area of the United States with resale to end-users in India. MMGS-S made contract payments in the United States through banking channels and a standby letter of credit.

In 2000, the plaintiff, Mega Vista Solutions (S) Pte Ltd ("MVS") succeeded MMGS-S with respect to all of MMGS-S's business activities. MVS is a business entity organized under the laws of Singapore with a principal places of business in that country. MVS and UCAP memorialized their relationship in a letter agreement, dated June 27, 2000, restating the parties' relationship ("the 2000 letter agreement"), with UCAP in Singapore sending the letter to MVS's offices in Singapore. The terms of the 2000 agreement, for all relevant purposes, were the same as reflected in the 1993 and 1995 agreements, including the following paragraphs:

> This is to confirm Union Carbide's interest in selling to M/s Megavisa Solutions (S) Pte Ltd. (Megavisa) from time to time effective as of 1st July 2000, certain of Union

Case 3:03-cv-00900-AWT    Document 24-3    Filed 11/12/2003    Page 6 of 18

Page 4
2003 U.S. Dist. LEXIS 16643, *11; 2003-2 Trade Cas. (CCH) P74,164

Carbide's products for resale by Megavisa to customers located in India.

Each such sale, of course, would be contingent upon the continuing interest of Megavisa and Union Carbide and a mutual agreement [*12] on specific terms including volume, specifications, price, payment and delivery. . .

. . . .

We sincerely look forward to developing a mutually beneficial relationship in the days ahead.

The 2000 letter agreement had a one year duration and authorized UCAP to terminate it on 90 days notice. During the period covered by the 1995 and 2000 letter agreements, the resale of Union Carbide products accounted for at least 85% of the plaintiffs' business.

In or around August 1999, Union Carbide announced a plan of merger with the co-defendant herein, Dow Chemical Company ("Dow"). Dow is a corporation organized under the laws of Delaware, with a principal place of business in Midland, Michigan. The amended complaint alleges that with the plan of merger, the need dropped for the re-sale services in India previously performed by MVMS, MVS, MMGS and MMGS-S. Consequently, the amended complaint alleges that Union Carbide and its affiliates ceased acting consistently with their alleged contractual and legal obligations and, in particular, undertook efforts to establish Dow, untainted by the Bhopal tragedy, in place of the plaintiffs as a direct seller of products to endusers in [*13] India.

On February 6, 2001, Union Carbide merged with a subsidiary of Dow and became a wholly owned subsidiary of Dow. At around this time, Dow also created the defendant, Dow Chemical Pacific (Singapore) Private Ltd. ("Dow Singapore"). Dow Singapore is a wholly owned subsidiary of Dow and is incorporated in Singapore with a principal place of business in that country. Dow created Dow Singapore to effectuate sales of Union Carbide products to the plaintiffs and to further Union Carbide and Dow's relationship with the plaintiffs. Dow Singapore succeeded to UCAP's relationship with MVS. On January 16, 2002, Dow Singapore advised MVS that, effective March 31, 2002, MVS would no longer be a distributor for Union Carbide products other than wire and cable compounds. MVS refused to continue the relationship with Dow Singapore on those terms.

On June 25, 2003, the plaintiffs MVMS (India), MVS (Singapore), MMGS (Texas) and MMGS-S (Singapore) commenced this lawsuit against the defendants, Union Carbide Corporation (Connecticut), Dow Chemical Company (Michigan), Union Carbide Asia Pacific, Inc. ("UCAP") (Singapore), Union Carbide Customer Service Pte Ltd ("UCCS") (Singapore), and Dow Chemical [*14] Pacific Private Ltd. (Singapore). The amended complaint alleges that, from 1993 through March 2002, Union Carbide and Dow, directly and through the above named affiliates, compelled the plaintiffs to agree to engage in a price maintenance conspiracy with respect to the resale of Union Carbide products in India, and refused to accept orders or cancelled accepted orders if the prospective resale prices to end-users in India were below certain levels. According to the amended complaint, Dow and Union Carbide sought to "ensure that prices charged by [the] plaintiffs to end-users in India for products would not cause erosion to prices for the products charged by [Union Carbide] and Dow to end-users. . . in the United States as well as in other jurisdictions. . ," and that,

> as a direct and proximate result of [the] defendants fixing of minimum resale prices and other terms of sale, competition in the sale and resale of [Union Carbide] products in and from the United States was improperly diminished and restrained. . .

Further, the amended complaint alleges that, starting in mid-1999 and continuing until 2002, Union Carbide, acting through the defendants, UCAP and UCCS, [*15] refused to authorize orders placed by the plaintiffs for Union Carbide products and arbitrarily declined to fill orders that had been placed and accepted, knowing that such actions would "severely damage[] [the] plaintiffs' relationships with long term strategic customers."

The amended complaint further alleges that after the merger, Dow, acting through the other defendant-affiliates herein, purposefully implemented a series of unjustified contract modifications, such as reducing the credit limit available to the plaintiffs and changing their billing practices, all to make it impossible for the plaintiffs to make timely payments on invoices. When, as a consequence, the plaintiffs were late in making payments, the amended complaint alleges that the defendants imposed a credit hold on shipments to the plaintiffs, and deliberately refused to release pending orders.

Further, the amended complaint alleges that: (1) Dow, acting through Dow India, contacted the plaintiffs' customers and told them that the plaintiffs were experiencing financial difficulties and, in this way, under-

Case 3:03-cv-00900-AWT    Document 24-3    Filed 11/12/2003    Page 7 of 18

2003 U.S. Dist. LEXIS 16643, *15; 2003-2 Trade Cas. (CCH) P74,164

Page 5

mined the plaintiffs' relationships with their customers at a time when the plaintiff were unable to [*16] obtain shipments due to the changes in billing and credit terms, causing the plaintiffs' customers to establish relationships with other vendors; and (2) the defendants, in order to induce the plaintiffs to disclose confidential customer information, characterized the parties' future relationship as long term, and then used the confidential information to establish direct sales to the plaintiffs' customers.

**STANDARD**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) must be granted if a plaintiff has failed to establish subject matter jurisdiction. Golden Hill Paugussett Tribe of Indians v. Weicker, 839 F. Supp. 130, 136 (D. Conn. 1993). In analyzing a motion to dismiss under Rule 12 (b)(1), the court must accept all well pleaded factual allegations as true and must draw reasonable inferences in favor of the plaintiff. Capitol Leasing Co. v. F.D.I.C., 999 F.2d 188, 191 (7th Cir. 1993). Where a defendant challenges the district court's subject matter jurisdiction, the court may resolve disputed factual issues by reference to evidence outside the pleadings, such as affidavits. Antares Aircraft, L.P. v. Federal Republic of Nigeria, 948 F.2d 90, 96 (2d Cir. 1991). [*17]

The defendants have also moved to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). When ruling on a 12(b)(6) motion, the court must presume that all well-pleaded facts alleged in the complaint are true and draw all reasonable inferences from those facts in favor of the plaintiff. Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993). The court may consider only those facts "stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." Allen v. Westpoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991). A court may dismiss a complaint at this stage only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim." Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974).

**DISCUSSION**

I

Federal Antitrust Claim

The defendants first move to dismiss count one of the amended complaint which alleges that the defendants coerced the plaintiffs into agreeing to fix the resale price of Union Carbide products in India, in violation [*18] of the Sherman Antitrust Act, 15 U.S.C. § 1. The defendants assert that, because the amended complaint alleges price fixing occurring in India that is not alleged to have a direct, substantial and reasonably foreseeable effect on the domestic commerce of the United States, the court is deprived of subject matter jurisdiction over the claim by the Foreign Trade and Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a. In response, the plaintiffs assert that, because price fixing is per se illegal under the Sherman Act, there is a presumption of anticompetitive effect constituting a direct, substantial and reasonably foreseeable effect on United States commerce and, hence the court has jurisdiction to hear the claim.

Section 1 of the Sherman Act provides in relevant part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1. An agreement between a manufacturer and a distributor to fix prices is per se illegal under the Sherman Act. Monsanto Company v. Spray-Rite Service Corp., 465 U.S. 752, 759, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984); [*19] see also Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S. Ct. 376, 55 L. Ed. 502 (1911) (vertical price fixing is per se illegal). "Per se violations do not require a showing of deleterious impact on competition. . . [and] create a presumption of anticompetitive effect." Gianna Enterprises v. Miss World Ltd., 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982); see also United States v. National Assoc. of Real Estate Bds., 339 U.S. 485, 489, 70 S. Ct. 711, 94 L. Ed. 1007 (1950). This is so because of their "pernicious effect on competition and lack of any redeeming virtue." Northern Pacific Railroad Co. v. United States, 356 U.S. 1, 5, 78 S. Ct. 514, 518, 2 L. Ed. 2d 545 (1958).

The reach of the Sherman Act, however, is limited. Metallgesellschaft AG v. Sumitomo Corp., 325 F.3d 836, 838 (7th Cir. 2003). Under an amendment to the Sherman Act, known as the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), the court does not have jurisdiction to adjudicate antitrust conduct that:

> involves trade or commerce (other than import trade or import commerce) with foreign [*20] nations unless:
>
> (1) such conduct has a direct, substantial, and reasonably foreseeable effect:
>
> (A) on trade or commerce which is not

Case 3:03-cv-00900-AWT   Document 24-3   Filed 11/12/2003   Page 8 of 18

Page 6

2003 U.S. Dist. LEXIS 16643, *20; 2003-2 Trade Cas. (CCH) P74,164

trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce With foreign nations, of a person engaged In such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of [the Sherman Act], other than this section.

If [the Sherman Act applies] to such conduct because of the operation of paragraph (1)(B), then [the Sherman Act] shall apply to such conduct only for injury to export business in the United States.

Id. Consequently, antitrust conduct directed at foreign markets that has no effect on the domestic market is beyond the reach of this court. Kruman v. Christie's Int'l PLC, 284 F.3d 384, 395 (2d Cir. 2001); Metallgesellschaft AG v. Sumitomo Corp., 325 F.3d at 838. Where there is a domestic effect, the court has jurisdiction to hear the claim only where the conduct "reduces the competitiveness of the domestic market. . .[or] makes possible anticompetitive [*21] conduct directed at domestic commerce." Id. at 399-401 (citing National Bank of Canada v. Interbrook Card Assoc., 666 F.2d 6, 8 (2d Cir. 1981)). To establish jurisdiction, a plaintiff need only demonstrate conduct directed "at both domestic and foreign markets [that] actually reduced the competitiveness of a domestic market. . . [or] [otherwise] makes possible anticompetitive conduct that 'give[] rise to a claim' under the Sherman Act." Kruman, 284 F.3d at 401.

Because the amended complaint alleges a per se violation of the Sherman Act, the anticompetitive effect of the alleged conduct is presumed. Because the amended complaint and evidentiary record support the conclusion that such conduct was directed at both the foreign and domestic market, the court concludes that it has jurisdiction. The amended complaint alleges that the defendants coerced the plaintiffs into agreeing to fix the resale price of Union Carbide products in India, and that they did so in order to "ensure that prices charged by [the] plaintiffs to end-users in India for products would not cause erosion to prices for the products charged by [Union Carbide] and [*22] Dow to end-users. . . in the United States as well as in other jurisdictions. . ," and that,

as a direct and proximate result of [the] defendants fixing of minimum resale prices and other terms of sale, competition in the sale and resale of [Union Carbide] products in and from the United States was improperly diminished and restrained. . .

Further, documentary evidence submitted in connection with the instant motion suggest that the defendants made pricing decisions for the Indian market based on anticipated domestic market consequences. n3 Because there is alleged antitrust conduct directed at both domestic and foreign markets, the plaintiffs have established that their claim involves a direct, substantial and reasonably foreseeable effect on the domestic commerce of the United States and, accordingly, the motion to dismiss count one for lack of subject matter jurisdiction is denied.

n3 By way of illustration, the record reflects various e-mails and correspondence in which: (1) the defendants refused orders placed by the plaintiffs because of domestic market pricing concerns (Decl. of R. Taffet, Exh.D); (2) that the defendants examined competitive pricing during world strategy meetings (Decl. of R. Taffet, Exh. E); and (3) that the defendants considered the firmness of domestic prices before deciding whether to meet competitive pricing in the India market. (Decl. of R. Taffet, Exh.H).

[*23]

II

The State Law Claims

Choice of Law

The defendants next argue that, under choice of law analysis, the laws of India or Singapore apply to the plaintiffs' state law claims. Consequently, for those state law claims set forth in the amended complaint that are not recognized under the laws of India or Singapore, the defendants argue that dismissal is appropriate. With respect to the claims that are recognized under foreign law, i.e., the breach of contract claims and the misrepresentation claims, the defendants argue that the law of Singapore or India is controlling. In response, the plaintiffs maintain that, to the contrary, under Connecticut choice of law rules, Connecticut law governs their claims and therefore, neither dismissal nor application of foreign law is appropriate here.

In a diversity action, a federal court must apply the choice of law rules of the forum state. Klaxon Co. v. Stentor Elec. Manufacturing Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 1021, 85 L. Ed. 1477 (1941). In Connecticut, the rule requires the court to select the

Case 3:03-cv-00900-AWT   Document 24-3   Filed 11/12/2003   Page 9 of 18

Page 7

2003 U.S. Dist. LEXIS 16643, *23; 2003-2 Trade Cas. (CCH) P74,164

local law of the state having the most significant relationship to the occurrence and the parties to the dispute. Reichhold Chemicals, Inc v. Hartford Accident & Indemnity Co., 243 Conn. 401, 408-14, 703 A.2d 1132 (1997); [*24] O'Connor v. O'Connor, 201 Conn. 632, 652, 519 A.2d 13 (1986); Restatement (Second) of Conflict of Laws § 188.

1. The Contract Claims

The amended complaint alleges causes of action based on Connecticut common law precepts concerning breach of contract and breach of the implied covenant of good faith and fair dealing. In applying the most significant relationship test in disputes involving contracts, the court examines: (a) the place of contracting, which is the place where occurred the last act necessary to give the contract binding effect; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. Reichhold Chemicals, Inc, 243 Conn. at 409-10; see also Restatement (Second) of Conflict of Laws § 188(e).

Applying these factors, the court concludes that the law of Singapore governs the contract claims. The amended complaint alleges contract violations beginning in mid-1999 and then continuing until the end of the parties' relationship in 2002. During this period, the [*25] relationship among the parties was governed by the 1995 and 2000 letter agreements. The parties do not dispute that the last act necessary for these two agreements to become binding occurred in Singapore and, specifically, with the confirmation letters that UCAP sent to MMGS and MVS from UCAP's offices in Singapore. Hence, the place of contracting is Singapore.

With respect to the second factor, i.e., the place of contract negotiation, there is simply no one place of contract negotiation. The plaintiffs negotiated the agreements from Singapore. Union Carbide claims to have negotiated them from Connecticut. With respect to the third factor, i.e., contract performance, there is, as well, no one place of contract performance. At least part of Union Carbide's contractual obligations were performed in Connecticut, as Union Carbide is headquartered in Danbury. The great majority of the performance contacts, however, occurred outside of the state of Connecticut and, specifically, in the Gulf states and Asia. In this regard, the products at issue were delivered to MMGS and MMGS-S in the Gulf states, and contract payments were made in the United States, though the amended complaint fails to [*26] identify any particular state or region.

There is also no link between Connecticut and the fourth consideration, that is, the location of the subject matter of the contract, i.e., the chemical products. With respect to the fifth consideration, i.e., the domicile, residence, nationality, place of incorporation and place of business of the parties, the relevant contacts point to Singapore. Specifically, three of four plaintiffs have offices in Singapore, three of five defendants have their principal place of business in Singapore (including UCAP, Dow Singapore, and UCCS), and two of the four plaintiffs (MMGS-S and MVS), and two of the defendants (Dow Singapore and UCCS) are incorporated in Singapore. In sum, the only contact that this case has to Connecticut is that it is the state where one of five named defendants is headquartered. This is an insufficient basis for applying Connecticut law. See e.g., Patch v. Stanley Works, 448 F.2d 483, 491 (2d Cir. 1971)(applying foreign law because "all the substantial contacts - save only the defendant corporation's factory and offices [located in Connecticut] - are found in New Hampshire"). The contract claims are therefore [*27] governed by Singapore law.

A. Breach of Contract

The defendants next move to dismiss count two of the amended complaint alleging breach of contract. The defendants argue that the letter agreements are not contracts but simply letters that impose no obligations upon the plaintiffs to make purchases or upon the defendants to make sales and, hence, are void for want of mutuality of obligation. Further, the defendants assert that, to the extent the plaintiffs intend to base their breach of contract claim upon agreements for specific product shipments, the plaintiffs have failed to allege the essential elements for such a claim.

In response, the plaintiffs maintain that the letter agreements do constitute valid contracts and that, while certain terms were left to future agreement, such terms were agreed upon and reflected by invoices and other transactional documentation and that, moreover, the parties' course of dealing reflects the parties' recognition that binding contractual obligations existed. Further, the plaintiffs assert that, contrary to the defendants' argument, the amended complaint sets forth the essential elements for the breach of contract claim under Fed. R. Civ. P. 8(a), [*28] in that, among other things, the defendant allegedly refused to fill orders that had already been accepted.

(i) The Letter Agreements

The court agrees with the defendants that the letter agreements do not constitute enforceable contracts as they are unenforceable for want of mutuality. As set

Case 3:03-cv-00900-AWT    Document 24-3    Filed 11/12/2003    Page 10 of 18

Page 8
2003 U.S. Dist. LEXIS 16643, *28; 2003-2 Trade Cas. (CCH) P74,164

forth above, Connecticut choice of law principles direct that the law of Singapore govern the contract claims. Under Singapore law, mutuality of obligation is necessary for a contract to be enforceable. n4 It is generally accepted in the common law of this country that agreements that impose no specific purchase obligation on a distributor cannot obligate a manufacturer to sell to the distributor. Billings Cottonseed, Inc v. Albany Oil Mill, Inc., 173 Ga. App. 825, 328 S.E.2d 426, 430 (Ga. App. 1985). In such cases, mutuality of obligation is lacking, and the agreement is therefore unenforceable. Kraftco Corporation v. Kolbus, 1 Ill. App. 3d 635, 274 N.E.2d 153, 156 (Ill.App. 1971) (holding that an alleged oral agreement between a manufacturer and a distributor lacked mutuality of obligation, and was enforceable where the distributor "had no obligation [*29] to sell any specific quantity and no obligation to meet any quotas"). "An agreement that does not expressly or impliedly require the distributor to purchase any amount of product from the manufacturer is more accurately characterized as an offer to buy, rather than a binding contract." Parks v. Baldwin Piano & Organ Co., 262 F. Supp. 515, 519 (D. Conn. 1967) ("At most, the terms of this purported contract were binding only as to deliveries actually made under it.") aff'd, 386 F.2d 828 (2d Cir. 1967). Moreover, under current orthodoxy, an obligation cannot be constructed based on an illusory or indefinite promise, that is, a promise "cloaked in promissory terms, but which, on closer examination, reveals that the promisor is not committed to any act or forbearance." See Calamarie & Perillo, The Law of Contracts, § 4.12(b)(4) (Mutuality of Obligation and Illusory Promises) (2001).

> n4 The defendants have submitted the affidavit of one Edward Lam Chung Weng, an advocate and solicitor of the Supreme Court of the Republic of Singapore. In his statement at P15, Weng asserts that under the law of Singapore, if "a distribution agreement contains no provision, express or implied, requiring both parties to buy and sell from one another, Singapore courts will not impose liability on the supplier for refusing to accept orders from the distributor." The plaintiffs do not challenge the statement. Accordingly, the court concludes that under Singapore law, as with the common law found in the United States, mutuality is required for enforcement of an contract.

[*30]

The amended complaint alleges contract breaches beginning in mid-1999 and continuing thereafter through 2002. The applicable letter agreements are the 1995 and 2000 agreements. Because the authenticity of these documents are not in dispute, the court may consider them at the Rule 12(b)(6) juncture. See Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1219-20 (1st Cir. 1996) (noting that written documents integral to a complaint, including contracts, are not considered matters outside the pleadings for purposes of Rule 12(b)). Each of the agreements state, in relevant part:

> This is to confirm Union Carbide's interest in selling to [the plaintiff] from time to time effective as of 8th September, 1995, certain of Union Carbide's products for resale by [the plaintiff] to customers located in India.
>
> Each such sale, of course, would be contingent upon the continuing interest of [the plaintiff] and Union Carbide and a mutual agreement on specific terms including volume, specifications, price, payment and delivery. However, certain aspects of our dealings should be consistent such as the following.
>
> - Unless otherwise specified by the parties, [*31] all shipments under this contract shall be made on MMGS's behalf and in MMGS's name as shipper. . .
>
> . . . .
>
> We sincerely look forward to developing a mutually beneficial relationship in the days ahead.

As set forth above, the letter agreements do not obligate Union Carbide to sell anything to the plaintiffs or require the plaintiffs to purchase any products from any of the defendants. The language of the letters is illusory, reflecting only Union Carbide's "interest" in selling products to the plaintiffs. The actual sale, as the letters make clear, would be contingent upon a future mutual agreement on specific contract terms. The letters set no purchase quotas nor require the plaintiffs to deal exclusively n5 in the defendants' products. Instead of obligating the defendants to make sales, the letter agreements merely state certain terms, i.e., transportation terms, that would apply if the parties later agreed on a particular sale. Consequently, the agreements reflect an indefinite arrangement, imposing no executory obligation on Union Carbide. While evidence of the parties' course of dealing may further define the undertaking at issue here, it cannot be employed to [*32] override the clear and unambiguous language of these agreements.

Case 3:03-cv-00900-AWT   Document 24-3   Filed 11/12/2003   Page 11 of 18

Page 9

2003 U.S. Dist. LEXIS 16643, *32; 2003-2 Trade Cas. (CCH) P74,164

See e.g., Crescent Oil & Shipping Services, Ltd. v. Phibro Energy, Inc., 929 F.2d 49, 52 (2d Cir. 1991). Such indefinite agreements as exist here, devoid of the fundamental requisite of mutuality of obligation, are not enforceable against Union Carbide and do not constitute binding contracts for breach of which an action for damages may be maintained. At most, the terms of the agreements were binding as to sales actually made.

> n5 If the plaintiffs had promised to obtain the products exclusively from the defendants, a valid requirements contract may well have existed. "In the absence of such a promise [of exclusivity], or some other form of consideration, the requisite mutuality and consideration for a requirements contract is absent." Billings Cottonseed, Inc v. Albany Oil Mill, Inc., 173 Ga. App. 825, 328 S.E.2d 426, 429 (Ga. App. 1985). Without an exclusive arrangement, "the promise of the seller becomes merely an invitation for orders and a contract is not consummated until an order for a specific amount is made by the buyer." Id. (citing Propane Industrial v. Gen. Motors Corp., 429 F. Supp. 214, 219 (W.D. Mo. 1977)). See also Wood v. Lucy, Lady Duff-Gordon, 222 NY 88, 90-91, 118 NE 214, 214 (1917) and Uniform Commercial Code § 2-304 (implying promise on part of seller to use best efforts to supply goods — a promise constituting valid consideration so as to defeat a claim of lack of mutuality — where buyer agrees to deal exclusively in the seller's products)).

[*33]

(ii) Agreements for Specific Product Shipments

The court agrees with the plaintiffs that the amended complaint alleges with sufficient particularity a cause of action for breach of contract in connection with specific product shipments that the defendants allegedly agreed to make under the letter agreements but refused to fill. As set forth above, Connecticut choice of law principles direct that the law of Singapore govern the contract claims. Under Singapore law, the elements of a cause of action for breach of contract are the same as exist under the common law of this country n6 and consist of allegations constituting: (a) the existence of a contract or agreement; (b) the defendant's breach of the contract or agreement; and (c) damages resulting from the breach. Chem-Tek, Inc. v. General Motors Corp., 816 F. Supp. 123, 130 (D. Conn. 1993). In this case, the amended complaint alleges that: (a) the plaintiffs and the defendants entered into a series of agreements whereby the plaintiffs purchased products from the defendants; (b) that the defendants breached their obligations and duties under these agreements by, among other things, failing to fill accepted orders [*34] and release accepted orders; and (c) that the plaintiffs suffered damages as a result. This constitutes a "short and plain statement of the claim" as required by Federal Rule of Civil Procedure 8(a).

> n6 Affidavit of Edward Lam Chung Weng, advocate and solicitor of the Supreme Court of the Republic of Singapore, at PP6-8.

B. Breach of The Implied Covenant of Good Faith And Fair Dealing

In count three, the amended complaint alleges a cause of action for breach of the covenant of good faith and fair dealing that is implied in every contract. Because this cause of action is derivative of an action for breach of contract, see e.g., Alter v. Bogoricin, 1997 U.S. Dist. LEXIS 17369, No. 97 Civ. 0662, 1997 WL 691332, *7 (S.D.N.Y. 1997); Union Trust Co. v. 714 Main Associates, 1993 Conn. Super. LEXIS 115, No. 312088, 1993 WL 7562, *15 (Conn. Super. Ct, January 6, 1993), the same choice of law analysis applies to the implied covenant claim as applies to the breach of contract claim and, accordingly, the law of Singapore governs. As [*35] the law of Singapore does not authorize an action for breach of the implied covenant of good faith and fair dealing n7, dismissal is required. See e.g., Atlantic Richfield Co. v. ARCO-Globus Int'l Co., 1996 U.S. Dist. LEXIS 19155, No. 95 Civ. 6361, 1996 WL 742863, *5 (S.D.N.Y. 1996) (dismissing common law claim alleging unfair competition because choice of law rules dictated that Russian law apply, and complaint did not articulate a basis for relief under Russian law).

> n7 Affidavit of Edward Lam Chung Weng, advocate and solicitor of the Supreme Court of the Republic of Singapore, at P36.

2. The Tort Claims

The amended complaint also alleges causes of action based on Connecticut common law precepts concerning fraudulent misrepresentation, negligent misrepresentation, tortious interference with business expectancies, tortious interference with contractual relationship, and unfair competition. Connecticut's choice of law rules for tort claims require the court to apply the law of the state with the most significant [*36] relationship to the occurrence and the parties. O'Connor v. O'Connor, 201 Conn. 632, 652, 519 A.2d 13 (1986); see also Pollack v. Bridgestone/ Firestone, Inc., 939 F. Supp. 151, 153 (D. Conn. 1996). In making this determination, the court

Case 3:03-cv-00900-AWT   Document 24-3   Filed 11/12/2003   Page 12 of 18

Page 10

2003 U.S. Dist. LEXIS 16643, *36; 2003-2 Trade Cas. (CCH) P74,164

considers:

a) the place where the injury occurred;

b) the place where the conduct causing the injury occurred;

c) the residence, place of incorporation and place of business of the parties; and

d) the place where the relationship, if any between the parties is centered.

Id. "The court must also consider the relevant policies and interests of each state involved (citations omitted). These factors 'are to be evaluated according to their relative importance with respect to the particular issue.'" Pollack v. Bridgestone/ Firestone, Inc., 939 F. Supp. 151, 153 (D. Conn. 1996) (quoting Restatement (Second) Conflicts of Law § 145(2) (1971)).

Applying the above, the court concludes that the law of India governs the tort claims. The amended complaint alleges that Union Carbide, acting through it subsidiaries, the defendants, UCAP and UCCS, and the defendant Dow, [*37] acting through Dow Singapore, orchestrated a scheme to usurp the plaintiffs' business in India and, in this way, injure the plaintiffs in India. The place of injury is therefore India.

With respect to the second consideration, i.e., the place where the conduct causing the injury occurred, the amended complaint fails to point to any one location. In this regard, the amended complaint alleges that Union Carbide of Danbury Connecticut, acting through it's subsidiaries UCAP and UCCS in Singapore, refused to authorize orders for products that had been placed by the plaintiffs, and arbitrarily declined to fill other orders, knowing that such actions would "severely damage[] [the] plaintiffs' relationships with long term strategic customers." Further, the amended complaint alleges that after the Union Carbide-Dow merger, Dow of Michigan, acting through Dow of India, and Union Carbide, acting directly and through its affiliate co-defendants in Singapore, undermined the plaintiffs' relationships with the plaintiffs' customers through misrepresentation and through modifications to their billing practices, and further induced the plaintiffs, through false statements, to disclose confidential [*38] client information for exploitation by Dow. This conduct, as set forth above, presumably occurred in multiple places, including India, Singapore, Michigan, and Connecticut. While the plaintiffs argue in their brief that the tortious conduct emanated from Union Carbide's headquarters in Connecticut, the amended complaint does not allege any such conduct as emanating exclusively from, or occurring solely in Connecticut. See e.g., O'Brien v. National Property Analysts Partners, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) (papers in response to a motion to dismiss cannot cure a defect in the pleadings). There is, accordingly, no one place of alleged tortious conduct.

With respect to the third element, i.e., the residence, place of incorporation and place of business of the parties, the weight of the contacts point to Singapore. Although there are significant contacts in the United States generally and, in particular, the Gulf states, the only contact that this case has to Connecticut is that it is the state where Union Carbide is headquartered.

The last element, i.e., the center of the parties' relationship -- is India. The purpose of the parties' relationship was [*39] the resale of chemical products in India.

Moreover, the amended complaint alleges that Dow and Union Carbide conducted business with the plaintiffs through the non-party subsidiary, Dow India, in India, and through defendants UCAP, UCCS, and Dow Singapore for the purpose of generating sales in India. Based on a review of the factors set forth above, and the relevant policies and interests of each state involved, the court concludes that the law of India governs the causes of action arising in common law tort.

> 1. Tortious Interference with Business Expectancies, Tortious Interference with Contractual Relationships, Unfair Competition, CUTPA, and the Connecticut Antitrust Act.

In counts six, seven, and eight, the amended complaint alleges violations of common law precepts concerning tortious interference with business expectancies, tortious interference with contractual relationships, and unfair competition. Because the law of India does not provide a similar basis for relief n8, dismissal is required under Federal Rule of Civil Procedure 12(b)(6). See e.g., Atlantic Richfield Co. v. ARCO-Globus Int'l Co., 1996 U.S. Dist. LEXIS 19155, No. 95 Civ. 6361, 1996 WL 742863, *5 (S.D.N.Y. 1996) [*40] (dismissing common law claim alleging unfair competition because choice of law rules dictated that Russian law apply, and complaint did not articulate a basis for relief under Russian law).

> n8 Affidavit of Som Mandal at PP18 and 22. Mandal is a member of the Supreme Court Bar Association of India and the Delhi High Court Bar Association.

Case 3:03-cv-00900-AWT    Document 24-3    Filed 11/12/2003    Page 13 of 18

Page 11
2003 U.S. Dist. LEXIS 16643, *40; 2003-2 Trade Cas. (CCH) P74,164

Further, in counts nine, ten, eleven, and twelve, the amended complaint alleges violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b, and the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-26 and 35-28(a). Because these causes of action are based upon elements of unfair competition similar to that which is found in the common law of unfair competition, the same choice of law analysis applies to the CUTPA and Connecticut antitrust claims as applies to the tort claims. See e.g., Emhart Industries, Inc. v. Duracell International, Inc., 665 F. Supp. 549, 568 (M.D. Tenn. 1987) (applying choice of law [*41] analysis applicable to tort claims to CUTPA claim). As the law of India does not authorize an action for unfair trade practices or antitrust, dismissal is required as well for the CUTPA claims and the Connecticut antitrust claim. See C.A. Westel de Venezuela v. American Telephone and Telegraph Co., 1992 U.S. Dist. LEXIS 12301, No. 90 Civ. 6665 (PKL), 1992 WL 209641, *13 (S.D.N.Y. Aug. 17, 1992) (dismissing state unfair competition claim because the applicable Venezuelan law did not recognize that claim); USGI, Inc. v. Michele Limited Partnership, 1990 U.S. Dist. LEXIS 19067, No. Civ. B-88-229 (JAC), 1991 WL 152445, *4 (D. Conn. Jan. 26, 1990) (a CUTPA claim can be asserted only "when choice of law principles indicated applicability of Connecticut law.").

2. Fraudulent Misrepresentation/Non-Disclosure and Negligent Misrepresentation

The defendants next move to dismiss counts four and five of the amended complaint alleging causes of action for fraudulent misrepresentation/non-disclosure and negligent misrepresentation. In counts four and five, the amended complaint alleges that the defendants misrepresented and/or failed to disclose material facts relating to: (a) the plaintiffs' continuing [*42] status under the contractual agreements; (b) the actual purpose behind the defendants' desire to obtain the plaintiffs' confidential customer information; and (c) the defendants' plans for distributing products directly to the plaintiffs' customers. The defendants maintain that dismissal of these claims is required because, even if there existed some form of contractual relationship between the parties, that relationship created no special duty requiring disclosure of their allegedly true intentions, and that, in any event, to the extent the plaintiffs relied on any alleged misrepresentation, such reliance was unjustified.

The court concludes that amended complaint fails to state a claim for fraudulent misrepresentation/non-disclosure, but sufficiently alleges a cause of action for negligent misrepresentation. As previously discussed, Connecticut choice of law principles direct that the law of India govern the tort claims. Indian law recognizes a cause of action for fraudulent and negligent misrepresentation, n9 with the elements of these claims being the same as exist under the common law of this country. n10

  n9 Affidavit of Som Mandal at P7. Mandal is a member of the Supreme Court Bar Association of India and the Delhi High Court Bar Association. [*43]

  n10 Affidavit of Edward Lam Chung Weng, advocate and solicitor of the Supreme Court of the Republic of Singapore, at PP6-8.

A. Fraudulent Misrepresentation/Non-Disclosure

To prevail on a claim of fraudulent misrepresentation/nondisclosure, the plaintiffs are required to prove: (a) a material misrepresentation or omission for which the party has a duty to disclose; (b) an intent to defraud; (c) reasonable reliance on the representation; and (4) damages as a result. See Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995). "The key element in a case of fraudulent nondisclosure is that there must be circumstances which impose a duty to speak." Jackson v. Jackson, 2 Conn.App. 179, 194, 478 A.2d 1026 (1984). Usually, parties that deal with one another at arms length do not have a duty to explain or disclose to each other their understanding of the terms of a written contract. Topf v. Warnaco, Inc., 942 F. Supp. 762, 769 (D. Conn. 1996). In this case, the amended complaint alleges that the [*44] "defendants owed a duty to [the] plaintiffs" but fails to allege any facts indicating that the parties had a special/fiduciary or confidential relationship or that they were dealing with one another other than at arms-length. Accordingly, the court concludes that the defendants were not under a duty to disclose their understanding of the agreements and, therefore, dismissal is required for the claim of fraudulent misrepresentation/non-disclosure.

B. Negligent Misrepresentation

To prevail on a claim of negligent misrepresentation, the plaintiffs must prove that, in the course of business, profession, or employment, (a) the defendants supplied false information for the plaintiffs' guidance; (b) that the defendants failed to exercise reasonable care or competence in obtaining or communicating the information; and (c) that the plaintiffs justifiably relied upon the in-

Case 3:03-cv-00900-AWT    Document 24-3    Filed 11/12/2003    Page 14 of 18

2003 U.S. Dist. LEXIS 16643, *44; 2003-2 Trade Cas. (CCH) P74,164

Page 12

formation to their detriment. D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206, 217-18, 520 A.2d 217 (1987) (citing § 552 of the Restatement (Second) of Torts). Unlike a cause of action for fraudulent misrepresentation/non-disclosure, "no special relationship is required [*45] to state a claim of negligent misrepresentation." Williams Ford, Inc. v. Hartford Courant Co., 232 Conn. 559, 575, 657 A.2d 212, 221 (Conn. 1995).

The defendants have argued that the claim of negligent misrepresentation should be dismissed because, as with the claim of fraudulent misrepresentation, the amended complaint fails to allege a special relationship imposing a duty to disclose on the defendants, or justifiable reliance on the part of the plaintiffs. Although the court agrees with the defendants that the amended complaint fails to allege facts supporting a special relationship, no such relationship is required to state a claim for negligent misrepresentation. See Williams Ford, Inc. v. Hartford Courant Co., 232 Conn. 559, 575, 657 A.2d 212, 221 (Conn. 1995). Further, because the amended complaint sufficiently alleges that the plaintiffs reasonably relied on the defendants' alleged misrepresentations and omissions, and the reasonableness of that reliance is, in the end, an issue of fact exceeding the scope for dismissal under Fed. R. Civ. P. 12(b)(6), the motion to dismiss count five alleging negligent misrepresentation is denied.

**CONCLUSION** [*46]

For the foregoing reasons, the motion to dismiss count one of the amended complaint alleging violations of the Sherman Antitrust Act (document no. 81) is DENIED. The motion to dismiss the amended complaint (document no. 78) is GRANTED in part and DENIED in part. The motion is GRANTED with respect to the claim of: (1) breach of the implied covenant of good faith and fair dealing (count three); (2) fraudulent misrepresentation (count four); (3) tortious interference with business expectancies (count six); (4) tortious interference with contractual relationships (count seven); (5) unfair competition (count eight); (6) violations of the Connecticut Unfair Trade Practices Act (counts nine, ten and eleven); and (7) violations of the Connecticut Antitrust Act (count twelve). The motion is DENIED with respect to the claim of: (1) breach of contract; and (2) negligent misrepresentation.

It is so ordered this 12th day of September, 2003 at Hartford, Connecticut.

Alfred V. Covello

United States District Judge

LEXSEE 2003 U.S. DIST. LEXIS 18870

BRUCE GENTILE, Plaintiff,-against-THE TOWN OF HUNTINGTON and BRUCE RICHARD, Defendants.

CV-03-0636 (ADS) (WDW)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

2003 U.S. Dist. LEXIS 18870

October 22, 2003, Decided

**DISPOSITION:** [*1] Motion to dismiss complaint granted in part and denied in part.

**LexisNexis (TM) HEADNOTES- Core Concepts:**

**COUNSEL:** For Plaintiff: Gary W. Gramer, Esq., GARY W. GRAMER AND ASSOCIATES, Lake Grove, New York.

For Defendants: Keith J. Gutstein, Esq., KAUFMAN, SCHNEIDER & BIANCO, LLP, Jericho, New York.

**JUDGES:** ARTHUR D. SPATT, United States District Judge.

**OPINIONBY:** ARTHUR D. SPATT

**OPINION:**

### MEMORANDUM OF DECISION AND ORDER

**SPATT, District Judge.**

This action arises out of claims by Bruce Gentile (the "plaintiff" or "Gentile") against his former employer, the Town of Huntington (the "Town"), and his direct supervisor, Bruce Richard ("Richard") (collectively, the "defendants"), alleging that the defendants terminated him because of his disability in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., and the New York State Human Rights Law, New York Executive Law ("NYSHRL"), § 290 et seq.

Presently before the Court is the defendants' unopposed motion to dismiss the complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. [*2] ("Fed. R. Civ. P.").

### I. BACKGROUND

Unless otherwise noted, the facts are taken from Gentile's complaint filed February 10, 2003, which, for the purposes of this motion, the Court takes to be true. The plaintiff is a 50 year old male with diagnosed depression, seropositive rheumatoid arthritis, and lumbosacal radiculopathy. The plaintiff was employed by the Town for more than 14 years and served as the Town's Senior Sign Inspector for more than 6 years until his January 31, 2002 termination. Gentile's responsibilities as a Senior Sign Inspector included examining plans submitted for permits, investigating complaints and completing reports about illegal signs, and enforcing the Town Code with respect to signs.

During 1997, 1998 and 2000, the plaintiff requested, verbally and in writing, that, among other things, he be allowed to carry a radio/communication device of less weight; to wear insulated headgear and/or a hooded sweatshirt on cold days instead of the mesh uniform; and to be transferred to another department within the Town that did not require a mesh uniform. Although the Town provided the plaintiff with equipment that weighed less, without providing a reason, it refused [*3] to grant the plaintiff's other requests. At or about the time the plaintiff made these requests, the plaintiff filed grievances with his union and also filed a complaint with the Town's Office of Equal Employment Opportunity.

The plaintiff alleges that, on April 4, 2000, he was assaulted on the job by an outraged business owner and sustained severe injuries. The plaintiff claims that the Town and Richard failed to provide any medical attention for him. The next day, the plaintiff reported to work and was told that he was not allowed to press charges against the person who assaulted him. The plaintiff was further told that if he pressed charges, he would be "written up and terminated."

On April 18, 2001 and May 24, 2001, the Town's Office of Equal Employment Opportunity held hearings and recommended that "no action be taken in regard

to [Gentile's] requests for reasonable accommodation." Gentile alleges that as a result of him filing these complaints, the Town engaged in a practice of retaliation against him. This retaliation included placing the plaintiff on mandatory psychiatric leave of absence despite the Town's knowledge that the plaintiff had full medical clearance to perform [*4] his work if he was provided reasonable accommodations. In addition, the Town exhausted the plaintiff's bank of personal days for absences due to an on-the-job injury. The plaintiff also alleges that he was constantly scrutinized, ridiculed, and threatened by Richard.

The defendants' Affidavit in Support of Defendants' Motion to Dismiss, states that on or about August 16, 2001, the plaintiff served a notice of claim on the defendants. (Defs.' Aff. Supp. Mot. Dismiss P 3). However, the defendants failed to provide a copy of this notice, nor did they describe the nature of the claims alleged in the notice. Upon receiving the notice of claim, the defendants immediately served a demand for examination pursuant to New York General Municipal Law ("N.Y. Gen. Mun. Law") § 50-h. The defendants maintain that in response to their demand, the plaintiff's prior attorney, Susan M. Hall, Esq. ("Hall"), requested an adjournment of the examination on four occasions. The defendants submitted three letters, dated December 4, 2001, December 18, 2001, and January 8, 2002 (the "Hall letters"), which reflect the final three requests for adjournment. **Each of these letters contains the statement that "[this [*5] letter] will confirm our agreement that the plaintiff will not file a complaint in this matter until the defendant has had the opportunity to conduct the above mentioned 50-h hearing." No examination was ever conducted.**

On January 31, 2002, the plaintiff was terminated. The plaintiff retained new counsel and filed a charge of employment discrimination on the basis of disability with the Equal Employment Opportunity Commission ("EEOC"). On November 15, 2002, the plaintiff received a "right-to-sue" letter issued by the EEOC and on February 10, 2003, within 90 days of the plaintiff's receipt of the "right-to-sue" letter, Gentile commenced this action.

The defendants now move to dismiss the plaintiff's complaint pursuant to Rule 12(b)(1) on the grounds that the Court has no subject matter jurisdiction because Hall "agreed" that a complaint would not be filed until the defendants had the opportunity to conduct the Rule 50-h examination. The defendants further argue that the Court lacks subject matter jurisdiction over the NYSHRL employment discrimination claims because the plaintiff failed to subject himself to an examination pursuant to section 50-h of the General Municipal Law which [*6] they maintain is a prerequisite to filing that type of action against the Town and Richard.

## II. DISCUSSION

### A. Rule 12(b)(1) Standard of Review

Rule 12(b)(1) provides for the dismissal of a claim where a federal court "lacks jurisdiction over the subject matter" of the action. In considering a Rule 12(b)(1) motion, a court must assume that all factual allegations in the complaint are true and must draw all reasonable inferences in the light most favorable to the plaintiff. *See Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998); *see also Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992).

In support of their motion, the defendants submit an affidavit and documents which are not found in the pleadings. The Court may consider this material because "on a motion under [Rule] 12(b)(1) challenging the district court's subject matter jurisdiction the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits." *Antares Aircraft v. Federal Republic of Nigeria*, 948 F.2d 90, 96 (2d Cir. 1991), **vacated on other [*7] grounds,** 505 U.S. 1215, 120 L. Ed. 2d 892, 112 S. Ct. 3020, (1992); *see also Alonso v. Saudi Arabian Airlines Corp.*, No. 98 Civ. 7781, 1999 WL 244102, at *1 (S.D.N.Y. April 23, 1999).

### B. Ms. Hall's Letters

The defendants maintain that the Court lacks subject matter jurisdiction over the complaint because the plaintiff's previous counsel "agreed" that a complaint would not be filed until the Rule 50-h examination is conducted. In support of this argument, the defendants submitted the Hall letters, which each state that "[this letter] will confirm our agreement that the plaintiff will not file a complaint in this matter until the defendant has had the opportunity to conduct the above mentioned 50-h hearing."

The defendants contend that these representations create a "condition precedent" which must be satisfied prior to the plaintiff's commencement of the action. The Court disagrees. These letters do not specify as to which "matter" they are referring and the final letter was written more than three weeks prior to the plaintiff's January 31, 2002 termination, which, according to the defendants' motion, is the event upon which this lawsuit [*8] is based. (Defs.' Mem. Supp. Mot. Dismiss at 6). Preventing the plaintiff from filing his

complaint based upon vague representations made by the plaintiff's former attorney would severely prejudice the plaintiff.

The defendants' argument that they have been prejudiced because there has been an "extensive delay" with respect to the Rule 50-h examination is moot because, as set forth below, the defendants lack the statutory authority to conduct this examination. Accordingly, the Hall letters do not divest the Court of subject matter jurisdiction over the complaint.

C. The New York State Human Rights Law

The NYSHRL prohibits employment discrimination on the basis of a disability, N.Y. Exec. Law § 296(1)(a), and allows aggrieved employees to bring suit in any court of appropriate jurisdiction. N.Y. Exec. Law § 297(9). State claims brought under state law in federal court are subject to state procedural rules. *See Felder v. Casey,* 487 U.S. 131, 141, 101 L. Ed. 2d 123, 108 S. Ct. 2302 (1988).

1. The Notice of claim Rule

The defendants' contention that the Court lacks subject matter jurisdiction over the plaintiff's [*9] state law claims because the plaintiff failed to subject himself for the Rule 50-h examination is without merit because no such examination is required under the NYSHRL.

Section 50-h states that an examination shall only be held "wherever a notice of claim is filed against a ... town ...." N.Y. Gen. Mun. Law § 50-h(1). However, a notice of claim is not required under section 50-e(1) of the Municipal Law for claims of employment discrimination against a municipality such as the Town. *Hamm v. NYC Office of the Comptroller,* 1998 U.S. Dist. LEXIS 2345, No. 95 Civ. 6367, 1998 WL 92395, at *6 (S.D.N.Y. March 4, 1998) (holding that discrimination claims brought pursuant to Executive Law § 296 are not tort actions and are thus not subject to Section 50-e's notice of claim requirement); *see also Palmer v. City of New York,* 215 A.D.2d 336, 627 N.Y.S.2d 42, 215 A.D.2d 336, 627 N.Y.S.2d 42 (1st Dep't 1995) (the notice of claim requirement is not applicable to claims of discrimination under the Human Rights Law); *Dimonda v. New York City Police Dep't,* 1996 U.S. Dist. LEXIS 5286, No. 94 Civ. 0840, 1996 WL 194325 (S.D.N.Y. April 22, 1996) (the notice of claim provisions embodied in sections [*10] 50-e and 50-i are not applicable to claims of discrimination brought pursuant to Executive Law § 296) (citations omitted).

Moreover, the notice of claim requirement under New York County Law § 52(1) does not apply to claims brought against the defendants as there is a clear distinction between claims brought against municipal defendants and claims brought against county defendants. *See Keating v. Gaffney,* 182 F. Supp. 2d 278, 290-291 (E.D.N.Y. 2001) ("employment discrimination claims [brought] against municipal as opposed to county defendants are exempt from the notice of claim requirement"); see also *Pustilnik v. Hynes,* 2000 U.S. Dist. LEXIS 8718, No. 99 Civ. 4087, 2000 WL 914629, at * 7 (describing distinction between claims brought against municipal defendants and claims against county defendants).

The defendants' reliance on *Fodelmesi v. Schepperly,* 1993 U.S. Dist. LEXIS 5161, 1993 WL 127211 (S.D.N.Y. April 20, 1993) is unpersuasive. Although the court in *Fodelmesi* dismissed the plaintiffs' state law claims against the County and Village defendants because the plaintiffs failed to appear for a section 50-h examination, that case did not involve claims [*11] of employment discrimination. The defendants' reliance on *La Vigna v. County of Westchester,* 160 A.D.2d 564, 554 N.Y.S.2d 1014 (1st Dep't 1990) is similarly unpersuasive as that case does not indicate the nature of the claims at issue.

It should be noted that Gentile's complaint does not allege that a notice of claim was ever filed. Although the defendants' attorney's affidavit indicates that a notice of claim was served by the plaintiff on or about August 16, 2001, (Defs.' Aff. Supp. Mot. Dismiss P 3), a copy of this notice was not submitted to the Court. The fact that the Court is not able to analyze the contents of the notice coupled with the fact that it was allegedly filed more than five months prior to the plaintiff's termination limits the Court's consideration of the notice.

Accordingly, the defendants' motion to dismiss the NYSHRL claims against the Town and Richard based on the plaintiff's failure to attend the Rule 50-h examination is denied.

2. Individual Liability Under the NYSHRL

The NYHRL has two provisions under which Richard could potentially be held individually liable: Sections 296(1) and 296(6). Section 296(1) of the NYHRL renders it [*12] unlawful "for an employer ... because of the ... disability ... of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a). An individual supervisor such as Richard may be sued under Section 296(1) but only

if he is shown either to have an ownership interest or the "power to do more than carry out personnel decisions made by others." *Perks v. Town of Huntington*, 251 F. Supp. 2d 1143, 1160 (E.D.N.Y. 2003) (citing *Patrowich v. Chemical Bank*, 63 N.Y.2d 541, 542, 483 N.Y.S.2d 659, 473 N.E.2d 11 (1984)). Individual liability under section 296(1) is limited and includes only supervisors, who themselves, have the authority to "hire and fire" employees. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995); *see also Perks*, 251 F. Supp. at 1160. Here, even after construing the facts in the light most favorable to the plaintiff, it is not clear as to whether or not Richard had the authority to hire and fire [*13] employees.

In any event, the plaintiff's NYSHRL claims may be maintained against Richard because section 296(6) provides a broader sense of personal liability. Section 296(6) makes it an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." N.Y. Exec. Law § 296(6). Thus, because the complaint alleges that Richard "actually participated in the conduct giving rise to [the] discrimination claim," Richard can be held individually liable under NYSHRL. *Tomka*, 66 F.3d at 1317.

Accordingly, the plaintiff may maintain a NYSHRL employment discrimination claim against Richard.

C. The Americans With Disability Act

I. Individual Liability Under the ADA

Unlike the NYSHRL, under the ADA an individual may not be held personally liable for the for employment discrimination. *See Hallet v. N.Y.S. Dep't of Correctional Services*, 109 F. Supp. 2d 190, 199 (S.D.N.Y. 2000). The ADA "provides disabled individuals redress for discrimination by a 'public entity.' That term, as defined in the statute, does not include individuals. [*14] " Id. at 199 (citations omitted); *see also Menes v. CUNY Univ. of N.Y.*, 92 F. Supp. 2d 294, 306 (S.D.N.Y. 2000) ("Individual defendants may not be held personally liable for alleged violations of the ADA") (citations omitted).

Second Circuit precedent involving individual liability under Title VII of the Civil Rights Act of 1964 further supports the conclusion that an individual may not be held liable in her or his personal capacity under the ADA. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1321 (2d Cir. 1995) (holding that individual defendants may not be held liable for violations under Title VII); *see also Lane v. Maryhaven Center of Hope*, 944 F. Supp. 158, 162 (E.D.N.Y. 1996) (finding as a matter of law that the ADA does not provide for a cause of action against an employer's individual agents or employees); *Cerrato v. Durham*, 941 F. Supp. 388, 395 ("the Second Circuit's reasoning in Tomka is equally applicable to the question of individual liability under the ADA as well").

Furthermore, Richard may not be held liable in his official capacity under the ADA. *See Lane*, 944 F. Supp. at 162-63 (E.D.N.Y. 1996) [*15] (stating that individuals, named in their official or representative capacities as defendants, may not be held liable under the ADA); *see also Sutherland v. New York State Dep't of Law*, 1999 U.S. Dist. LEXIS 7309, No. 96 Civ. 6935, 1999 WL 314186, at *7 (citations omitted).

Accordingly, the motion to dismiss the ADA claims against Richard in both his individual and official capacities is GRANTED.

III. CONCLUSION

Based upon the foregoing, it is hereby

ORDERED, that the motion to dismiss the NYSHRL claims against the Town and Richard is DENIED; and it is further

ORDERED, that the motion to dismiss the ADA claims against the Town is DENIED; and it is further

ORDERED, that the motion to dismiss the ADA claims against Richard is GRANTED; and it is further

ORDERED, that the parties are directed to contact United States Magistrate Judge William D. Wall forthwith to schedule discovery.

SO ORDERED.

Dated: Central Islip, New York

October 22, 2003

ARTHUR D. SPATT

United States District Judge