HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1           MR. HUMES:  Thank you.  The --

2           A VOICE:  The next page.

3           MR. HUMES:  You indicated that we should

4     disregard the comments which were previously forwarded to

5     us.  That would mean -- you're indicating we should

6     disregard the October 7th comments, correct?

7           MR. DRDA:  Yeah.  I said that based on the

8     fact that they did not come from my office.

9           MR. HUMES:  Okay.  Now, the latest

10    submittal dated October 16th has been changed somewhat,

11    but is it a fair summary of your testimony today that we

12    should disregard the October 16th submittal as well?

13          MR. DRDA:  Well as with the October 7th

14    comments, these comments again were sent out without my

15    knowledge or without my input.  I spoke with Miss Weaver,

16    I asked her about the comments.  I got a copy of the

17    comments.  I thought I had clarified those comments with

18    her.  And then she again sent out these additional

19    comments without my review process or without my

20    knowledge.

21          MR. HUMES:  Okay.  I --

22          MR. DRDA:  I can't explain it.

23          MR. HUMES:  Alright, good.  What -- what

24    is going to -- I mean does Donna Weaver speak for the

197

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1    Department of Transportation?

2              MR. DRDA:  Miss Donna Weaver is the

3    contact point for reviewing the Siting Council cell tower

4    requests.

5              MR. TAIT:  That's the person that gets the

6    request from us or comment, it goes directly to her?

7              MR. DRDA:  That's correct.

8              MR. HUMES:  I guess I'm curious to know

9    whether or not during your discussions with her after

10   October 7th and before October 16th, since you say that she

11   previously sent a document without your knowledge or

12   permission, whether you've instructed her not to send

13   things over your signature?

14             MR. DRDA:  I did instruct her not to send

15   anything out under my signature.  And I thought that's

16   what was done, but I mean based on what's submitted here

17   before me, obviously that's not the case

18             MR. HUMES:  Okay.  Are you aware that when

19   the Applicant filed its application with the Siting

20   Council on or about March 3, 2003, it served a certified

21   copy of the -- actually, it hand-delivered a copy of the

22   application with the Commissioner of Transportation?

23             MR. DRDA:  I'm not aware of that.

24             MR. HUMES:  Are you aware that the Public

198

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1    Utility Environmental Standards Act requires the

2    applicant to serve the Department of Transportation at

3    the time of filing?

4              MR. DRDA:  No, I'm not.

5              MR. HUMES:  Okay.  Do you have any idea of

6    what the process is at DOT once the applicant has

7    complied with the service requirements, what happens to

8    the application?

9              MR. DRDA:  That's handled by Miss Donna

10   Weaver's bureau.  I'm not aware.

11             MR. HUMES:  Okay.

12             MR. TAIT:  And her bureau is again?

13             MR. DRDA:  Policy and Planning.

14             MR. TAIT:  Policy and Planning.

15             MR. ASHTON:  Does she forward the

16   application within DOT for comment?

17             MR. DRDA:  It's my understanding that's

18   the way the system is suppose to work.  I -- just for

19   clarification, we had an early retirement program this

20   year and a lot of people -- there was a lot of changeover

21   in personnel.  As indicated with my title, I'm in an

22   acting position as a director.  I've been in that

23   position since around the first of April.  This whole

24   issue just came to light in the last six weeks with this

199

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1    -- so, I'm not totally familiar with the process or

2    review process.  It's handled by a different bureau.  At

3    times they ask us for comments.  And it's my

4    understanding that's how this whole thing got started, is

5    comments were given to her, she put my name on it and

6    submitted it out.

7                    MR. TAIT:  Is she new to the job or has

8    she held this job for a while?

9                    MR. DRDA:  I couldn't tell you that, I

10   don't know.

11                   MR. PHELPS:  Many of the comments that we

12   receive from the Office of DOT are transmitted over in

13   the form of a facsimile with a fax cover sheet indicating

14   that it's coming from Donna Weaver's office.  And that's

15   certainly been the case since I've been on board.

16                   MR. HUMES:  What is Donna Weaver's title?

17                   MR. DRDA:  I don't know.

18                   MR. HUMES:  I noticed while you're

19   disavowing both the October 16th submittal and the October

20   7th submittal, there were a few changes between the

21   October 7th submittal and the October 16th submittal.  One

22   is that it changed a phrase that says Office of

23   Maintenance-Policy to Office of Maintenance-Guidelines.

24   Can you tell us what the difference is between a policy

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

200

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1    and a guideline?

2            MR. DRDA:  Well after receiving the first

3    letter that went out, I explained to Miss Weaver that as

4    far as I knew that was not policy out of the Office of

5    Maintenance, so I wanted her to take that off the docket

6    that she submitted.  So, you know, based on what I see

7    here before me, she changed it from policy to guidelines.

8            MR. HUMES:  I guess I'm not aware that a

9    single employee has the power to influence DOT

10   communications like that.  The --

11           MR. SPIRER:  Was that a question?

12           MR. HUMES:  No.  Withdrawn.  Are you aware

13   of any cell towers in the State of Connecticut that are

14   located within -- that have a fall zone that would be

15   within a state highway system?

16           MR. DRDA:  I really can't answer that

17   question.  I mean I'm not --

18           MR. HUMES:  Are there --

19           MR. DRDA:  A lot of places I don't know

20   where the access or -- you know, the State right-of-way

21   ends and the heights of the towers and -- I mean without

22   getting a specific location.

23           MR. HUMES:  Well, have you ever seen a

24   tower that's close to a road in the State of Connecticut?

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1        MR. DRDA:  I have seen numerous towers.

2    I've seen them along the countryside.  I mean with

3    respect to the proximity of the state highway system,

4    none that I felt would -- I don't know -- no.

5        MR. HUMES:  Would you accept, subject to

6    check, that there's a tower that's 260 feet tall in

7    Montville at Troop E at I-395 that's 50 feet from the

8    state highway?

9        MR. CANNAVINO:  I'm going to object to the

10    question.  Are you asking the witness if he knows that?

11        MR. HUMES:  Yeah, I'm asking --

12        MR. DRDA:  I'm not aware of that.

13        MR. HUMES:  So you're not aware of any

14    tower in the State of Connecticut that has a fall zone

15    within the travel portion of a state road?

16        MR. MARCONI:  I think it's been asked --

17        MR. CANNAVINO:  Objection, asked and

18    answered.

19        MR. MARCONI:  Yeah, I think it has been

20    asked and answered that he's not aware of them.  I mean

21    that's not to say they don't exist, that's not to say

22    they do exist.  He just doesn't know of it.

23        MR. HUMES:  Okay.

24        MR. TAIT:  Mr. Humes -- (indiscernible) --

202

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1       Mr. Drda, in my files --

2                   COURT REPORTER:  Could you --

3                   MR. TAIT:  -- I have a document dated

4       April 7, 2003 -- from Donna Weaver to Derek Phelps, April

5       7, 2003, which says the current plan as submitted is not

6       expected to be inimical to the planning of this office,

7       Donna Weaver, Transportation Planner, reviewing agency.

8                   MR. HUMES:  I do recall --

9                   MR. TAIT:  Where does that one fall?  Why

10      did we get another one?  Who generated the second one?

11      Is this first one in the record anywhere?

12                  MR. MARCONI:  Does counsel know what

13      document we're referring to?

14                  MR. TAIT:  It says Docket 244.

15                  (Multiple voices overlapping,

16      indiscernible)

17                  MR. TAIT:  The standard request for

18      comments that we sent out with every docket.

19                  MR. HUMES:  I have it.  Comments received

20      --

21                  MR. PHELPS:  Mr. Tait, may I remark?

22                  MR. TAIT:  Yes.  As sent by Mr. Phelps to

23      the Council members.

24                  MR. PHELPS:  Yeah.  Precipitated by

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1    Council concerns or frustrations over the nature of the

2    comments received by DOT, I, as you may know, have for

3    several months been working to elicit more complete

4    useful comments from DOT.  Donna Weaver's remarks were

5    often not inimicable.  And it was a standard line that we

6    were used to seeing and Council members, and I think

7    including yourself, indicated that we should endeavor to

8    try to elicit more complete remarks.  That led to the

9    remarks that we received in early October.  But that, as

10   we've discussed here today, reflected that --

11                   MR. TAIT:  Was that generated from your

12   call to Donna Weaver?

13                   MR. PHELPS:  Yes, sir.

14                   MR. TAIT:  Okay --

15                   MR. PHELPS:  Yes, sir.

16                   MR. TAIT:  -- so there was a call from you

17   saying could you comment again, more completely than just

18   your --

19                   MR. PHELPS:  That's my recollection.  I --

20   I've been speaking to Donna Weaver more times than I can

21   recall.

22                   MR. TAIT:  So the April 7th memo is in the

23   file somewhere, yes?

24                   MR. PHELPS:  Yes, sir.  I'd also like to

204

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1    report that Donna Weaver was invited to be here today.

2    And I think the witness that's are in front of us now

3    endeavor to provide for that.  And no success.

4                    MR. TAIT:  I guess the basic question is -

5    - and I'm sure you have other questions -- is that a

6    valid regulation, forgetting who said what and who mis

7    said, is that a regulation or a guideline that we should

8    pay any attention to?  And can your attorney help us on

9    this?

10                   MR. CHARLES WALSH:  I would -- I would

11   suggest that the DOT will comment within the 30 day time

12   period on that and hopefully help to clarify the

13   Council's mind as to any ambiguities in this presentation

14   today.

15                   MR. TAIT:  You've heard our questions and

16   we would like it clarified.

17                   MR. O'NEILL:  And if I may --

18                   COURT REPORTER:  Could you state your name

19   for the record.

20                   MR. WALSH:  Yes.  I'm -- my name is

21   Charles Walsh.  I'm an Assistant Attorney General.  I

22   represent the DOT.

23                   COURT REPORTER:  Thank you.

24                   MR. MARCONI:  And I think with due respect

205

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1    to Assistant Attorney General Walsh, as I think he just

2    got brought into this just within the past couple of

3    hours, and I know him to be a superb attorney, so I know

4    that he will get to the bottom of finding out what

5    regulations and statutes do restrict us regarding

6    Department of Transportation related--

7                    MR. TAIT:  And if any other parties have-

8    -

9                    MR. CANNAVINO:  I just have --

10                    MR. TAIT:  -- questions that they want to

11   make sure are addressed in that period, please let Mr.

12   Walsh know them.

13                    MR. CANNAVINO:  I -- may I just -- inquire

14   of the witness briefly?

15                    MR. TAIT:  Sure -- yes.

16                    MR. CANNAVINO:  Thank you so much.

17                    MR. WALSH:  Could I get your name, sir?

18                    MR. CANNAVINO:  My name is John Cannavino.

19   I'm just going to -- just a couple of questions.

20                    MR. TAIT:  I don't want to interfere with

21   Mr. Humes' examination if --

22                    MR. CANNAVINO:  Oh, are you -- are you

23   finished, Mr. Humes, or --

24                    MR. HUMES:  I'm -- I'm finished.  I do

206

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1    have one point for Mr. Walsh to address as part of his

2    analysis.

3                    MR. TAIT:  Would you -- yes --

4                    MR. HUMES:  Do you want me to do that

5    after Mr. Cannavino?

6                    MR. TAIT:  No, right now.

7                    MR. HUMES:  Mr. Walsh, if you could please

8    address whatever requirements the DOT has visa vie

9    1650(w) and (x) of the General Statutes.  I think it

10   would be helpful to see what the DOT's view is of its

11   authority versus the authority of the Siting Council.

12                   MR. WALSH:  Well, I'll respond by saying

13   that the DOT will comment on the questions that were

14   raised by the Council.  And I'm not sure if they will go

15   into as full a detailed analysis as Attorney Humes would

16   like us to, but we will take that into consideration

17   Thank you.

18                   MR. TAIT:  We would appreciate whatever

19   help you can give us.

20                   MR. WALSH:  Thank you.

21                   MR. MARCONI:  And just to inform Attorney

22   Walsh, Attorney Humes is representing the applicant and

23   Attorney Cannavino is representing the Town of New

24   Canaan.

207

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1              MR. TAIT:  And Mr. Cannavino, I think Mr.

2       Fisher comes first in the list of --

3              MR. CANNAVINO:  Whatever order you like.

4              MR. TAIT:  Yes.  Mr. Fisher.

5              MR. FISHER:  I don't have any questions

6       for the witness, but if you'll indulge me just in terms

7       of this concept we're developing with DOT briefly.

8              MR. TAIT:  Briefly.

9              MR. FISHER:  Because I do think the

10      comment if it starts to show up in other dockets, it's a

11      general policy issue that I think carriers are concerned

12      with in terms of understanding DOT's position.  And if

13      it's not a regulation or statute from which that comment

14      regarding fall zones was derived, I would suggest,

15      although it's certainly not my place to say to an agency,

16      that it be reviewed internally before a formal policy

17      statement be given on these issues.

18              MR. DRDA:  Well just -- just for the

19      record -- well --

20              (Interruption)

21              MR. PHELPS:  Cell phones and pagers to

22      silent please.

23              MR. TAIT:  And Mr. Walsh --

24              MR. WALSH:  Yes?

208

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1            MR. TAIT:  -- this is our Docket No. 244

2    and we have never gotten this comment ever before.

3            MR. WALSH:  Understood.  Thank you.

4            MR. TAIT:  We don't know where it came

5    from out of the blue.  Okay.  Is that it, Mr. Fisher?

6            MR. FISHER:  Yes.

7            MR. TAIT:  Mr. Spirer.

8            MR. SPIRER:  Thank you.  Mr. Drda, is it -

9    - am I correct in understanding you did not draft the

10   memo that seems to be creating all of the concern today?

11           MR. DRDA:  That is correct.

12           MR. SPIRER:  And you didn't draft the one

13   on October 7 and you didn't draft the one that was

14   distributed on October 16th?

15           MR. DRDA:  That is correct.

16           MR. SPIRER:  Okay.  Do you ever draft

17   memos such as this in response to applications for cell

18   towers or requests from the Siting Council relating to

19   applications for cell towers?

20           MR. DRDA:  My unit has provided comments

21   in the past for applications for cell towers.  It is not

22   drafted under my signature.  It goes out -- the comments

23   are given to Miss Weaver and then she sends out the

24   comments to the Siting Council.  And I'm not sure of that

209
HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1    process and how it works.

2              MR. SPIRER:  Okay.  And am I correct in

3    understanding Miss Weaver is the contact person at DOT

4    for comments such as the ones we're dealing with here

5    today?

6              MR. DRDA:  That is correct.

7              MR. SPIRER:  And does she do this in the

8    ordinary and usual course of her employment at DOT?

9              MR. DRDA:  She doesn't report to me.  As

10   far I know she does, but I mean that's not under my

11   jurisdiction.

12             MR. SPIRER:  And the fact of the matter is

13   we'd have to ask Miss Weaver regarding the origin of this

14   comment and not you.  Is that a fair statement?

15             MR. DRDA:  That's correct.

16             MR. SPIRER:  Okay.  Now, you're listed as

17   the contact person, correct?

18             MR. DRDA:  Based on the memo, yes.

19             MR. SPIRER:  Right.  In fact, it would

20   appear that you're not listed as the author, but really

21   the contact person?

22             MR. DRDA:  That is the way it appears to

23   me.  I don't see -- I didn't get the full e-mail, I just

24   see the memo with my name at the bottom with my address

210

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1    based on the copy I have.

2                    MR. SPIRER:  And are you -- do you know

3    whether you're usually or customarily listed as the

4    contact person for comments such as the ones that we're

5    dealing with today?

6                    MR. DRDA:  No, I'm not.

7                    MR. SPIRER:  Okay.  Now, when counsel for

8    the Applicant says that you disavow these comments,

9    you're disavowing your authorship of these comments, is

10   that -- is that fair to say?

11                   MR. DRDA:  Well -- (pause) -- I disavowed

12   the fact that the memo was not sent out by me.  And I

13   notice that there was discrepancies in the comments and

14   that -- you know, so I was -- explained that I would get

15   it straightened out or try to straighten it out, but

16   these comments were not appropriate.

17                   MR. SPIRER:  You're denying the authorship

18   of the comments, correct?

19                   MR. DRDA:  That's correct.

20                   MR. SPIRER:  You're not denying that this

21   may be the policy of DOT?

22                   MR. DRDA:  That's correct.

23                   MR. SPIRER:  And you're not telling us

24   that this is the policy of DOT?

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1          MR. DRDA:  That's correct.

2          MR. SPIRER:  And to find out what the

3    policy of DOT really is, we're going to have to ask

4    somebody else?

5          MR. DRDA:  We're going to -- yes.

6          MR. SPIRER:  Nothing further.

7          MR. TAIT:  Mr. Cannavino.

8          MR. CANNAVINO:  He asked virtually every

9    question I would have asked except for one.  Did you see

10   the fax cover sheet that was attached to these comments

11   and sent to Mr. Phelps that's part of our file here?  You

12   may not have seen it.

13         MR. DRDA:  I may have, I don't know.  Do

14   you have a copy?

15         MR. CANNAVINO:  Yes.

16         MR. DRDA:  Okay.

17         MR. CANNAVINO:  Is this a DOT fax cover

18   sheet?

19         MR. DRDA:  Yes, it is.

20         MR. CANNAVINO:  And is that Donna Weaver's

21   name that appears on there?

22         MR. DRDA:  Yes.

23         MR. CANNAVINO:  And she's the person at

24   DOT who's -- who is authorized to communicate with the

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1       Siting Council and to communicate the DOT's comments?

2                       MR. DRDA:  To the best of my knowledge,

3       yes.

4                       MR. WILENSKY:  What's the date of that fax

5       cover sheet there, the one in your hand, sir?

6                       MR. DRDA:  10/16/03.

7                       MR. WILENSKY:  10/15 -- okay --

8                       MR. DRDA:  10/16 --

9                       MR. TAIT:  10/16 --

10                      MR. DRDA:  -- ten-one-six.

11                      MR. WILENSKY:  Thank you.

12                      MR. CANNAVINO:  No further questions.

13                      MR. TAIT:  Council questions?  Gerry, any

14      questions?

15                      MR. HEFFERNAN:  No questions.

16                      MR. TAIT:  Brian.

17                      MR. O'NEILL:  No questions.

18                      MR. TAIT:  Dan.

19                      MR. LYNCH:  Just -- I guess the question I

20      would have to ask is what role does Maintenance play in

21      this procedure, if anything at all?

22                      MR. DRDA:  Well at some point in time the

23      applicant for the siting of the cell tower would have to

24      go through the permit -- go through the district office

213

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1    and obtain a permit through the permit regulations--

2                    MR. TAIT:  A permit to do what, sir?  This

3    is on private property.

4                    MR. DRDA:  Well -- I'm sorry -- if -- if

5    the telecommunications company is requesting access

6    through a state highway system, they would have to apply

7    for a permit to provide access to that state highway

8    system.  And during --

9                    MR. TAIT:  In this particular docket were

10   they asking for access?

11                   MR. DRDA:  I couldn't even tell you.

12                   MR. MARCONI:  Are you talking about

13   getting a curb cut from --

14                   MR. DRDA:  Yes --

15                   MR. TAIT:  A curb cut?

16                   MR. DRDA:  Yes.

17                   MR. TAIT:  That's not involved in this

18   docket.

19                   MR. MARCONI:  If there was already a

20   driveway and it existed or a road that existed, then you

21   would not need DOT maintenance involvement?

22                   MR. DRDA:  Well, it depends on the

23   development of that property.

24                   MR. TAIT:  If it's on private property--

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

214

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1                 MR. DRDA:  If it's on private property and

2        you're accessing the state highway system--

3                 MR. TAIT:  Through an existing driveway,

4        would you get involved at all?

5                      (Pause)

6                 MR. WALSH:  Could you repeat the question

7        for him please.

8                 MR. TAIT:  If I in my house in Norfolk,

9        Connecticut wanted to put up a pole a hundred feet high

10       on my front lawn, would I need to go to you guys?

11                MR. WALSH:  If there's an existing

12       driveway there or --

13                MR. TAIT:  I'm using my own driveway.

14                MR. DRDA:  No.

15                MR. LYNCH:  So --

16                MR. TAIT:  So in this application, the

17       Applicant would not need your permission--

18                MR. DRDA:  If -- right.  If he's going to

19       construct a new driveway --

20                MR. TAIT:  No, no new driveway --

21                MR. DRDA:  -- an existing --

22                MR. TAIT:  -- an existing driveway on

23       private property --

24                MR. DRDA:  No.


POST REPORTING SERVICE
HAMDEN, CT   (800) 262-4102

215

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1           MR. TAIT:  So in that situation, you would

2    not be referred to internally in DOT for your opinion?

3           MR. DRDA:  That's correct.

4           MR. LYNCH:  So if I'm --

5           A VOICE:  But --

6           MR. LYNCH:  If I'm to understand you

7    correctly, then any involvement by Maintenance from the

8    DOT would be after the fact of a certificate being

9    issued?

10          MR. TAIT:  Dan, not necessarily if they

11   required a curb cut --

12          MR. LYNCH:  Yeah, okay --

13          MR. TAIT:  -- if the application required

14   it.

15          MR. LYNCH:  If at all, I guess.

16          (Pause)

17          MR. DRDA:  Under the conditions of the

18   permit regs, I mean once it's passed this Council and

19   they apply for a permit, then it would be after the fact.

20          MR. LYNCH:  Thank you.  That's all my

21   questions.

22          MR. TAIT:  I guess on my pole in my front

23   lawn, does it matter how high that pole goes before you

24   get involved or can I put a 200-foot pole on my front

216

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1    lawn?  Do you, DOT, get involved in my 200-foot pole?

2                    A VOICE:   (Indiscernible) -- paint it and

3    light it --

4                    MR. TAIT:   I may have to paint it and

5    light it for airplanes, but for you guys do I need any

6    permission from you guys?  Even though it's going to fall

7    across my driveway, across Route 272 and hit my

8    neighbor's house, do I need your permission?

9                    MR. DRDA:   I don't know.

10                    MR. TAIT:   Okay.  Dan, any further

11    questions?  Brian?

12                    MR. EMERICK:   Just as a council member

13    from another state agency, I have a lot of questions, but

14    none of which I'm going to ask here because they're

15    really not going to materially add to the record in this

16    proceeding.

17                    A VOICE:   Thank you.

18                    MR. TAIT:   Now if that was the criteria

19    for all our questions, Brian, we would be much shorter

20    here.  (Laughter).  Phil?

21                    MR. ASHTON:   I have one request to make of

22    the Assistant Attorney General for the DOT and that is in

23    reviewing the DOT policy -- could you hear me alright --

24                    A VOICE:   Yes.

217

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1          MR. ASHTON:  In reviewing the DOT policy

2   on fall zones, insofar as there is a fall zone that

3   applies to a structure such as a telecommunication tower,

4   I would ask whether or not that same requirement is

5   placed on utility poles, on trees, and on light

6   standards, all of which can fall, from my experience,

7   across the highway.  Are we -- in short, are we

8   consistent with other structures?

9          MR. TAIT:  Put that on your list --

10          MR. WALSH:  I think -- I think that -- I

11   think that that's something that the DOT will consider--

12          MR. ASHTON:  Yeah --

13          MR. WALSH:  -- in responding to the

14   Council --

15          MR. ASHTON:  Right.

16          MR. WALSH:  -- and appreciate the

17   opportunity --

18          MR. ASHTON:  I might even say church

19   steeples too for that matter because I can think of some

20   that are close to the highway.

21          MR. HUMES:  If I could just add to the

22   list DOT installed television cameras on poles.

23          MR. TAIT:  I think Mr. Walsh knows our

24   concerns.  Ed?

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

218

HEARING RE: OMNIPOINT FACILITIES NETWORK 2
NOVEMBER 10, 2003

1          MR. WILENSKY:  No, no questions.

2          MR. TAIT:  Okay.  Are we through with this

3   witness?  Christina, any questions?

4          MS. LEPAGE:  No questions.

5          MR. TAIT:  Okay.  We thank you very much

6   for interrupting your day on short notice and hope you've

7   had an enjoyable time here.  (Laughter).

8          MR. MARCONI:  Thank -- thank you very much

9   for taking your time out, Mr. Drda, and thank you very

10  much, Assistant Attorney General Walsh, for taking your

11  time out on short notice to come here.

12         MR. WILENSKY:  It's 4:00 o'clock you can

13  all go home now --

14         MR. TAIT:  And we would appreciate

15  whatever help DOT can give us on this question.

16         MR. PHELPS:  See you on Wednesday,

17  gentlemen.

18         COURT REPORTER:  Excuse me.  (Pause).

19  Okay.

20         MR. TAIT:  Are we ready to go back on to

21  the case?  And I believe the next person up is the Town

22  of New Canaan.

23         MR. SPIRER:  Mr. Vice Chairman --

24         MR. TAIT:  Oh, that's right, you had

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing was sent by first-class mail, postage

prepaid, this 3rd day of December, 2003, to the following counsel of record:

Mark R. Carta
Rucci, Burnham, Carta & Edelberg, L.L.P.
30 Old King's Highway South
P.O. Box 1107
Darien, CT 06820

_____
Brian O'Donnell

4